JULIA SADOFSKI, ADMINISTRATRIX OF THE ESTATE OF
KATHERINE BARON, PLAINTIFF-RESPONDENT, v.
JANET B. WILLIAMS, DEFENDANT-APPELLANT, AND
ELIZABETH C. NOEBELS, DEFENDANT.

Argued December 7, 1971—Decided April 24, 1972.

386

Mr. *Martin E. Kravarik* argued the cause for defendant-appellant (*Messrs. Selesky, Kolsky, Kravarik & Epstein,* attorneys; *Mr. Kravarik,* on the brief).

Mr. *Ricahrd F. Lert* argued the cause for plaintiff-respondent (*Messrs. Wilentz, Goldman & Spitzer,* attorneys; *Mr. Lerl and Mr. Vincent P. Maltese,* on the brief).

The opinion of the Court was delivered by

HALL, J. This litigation arises out of an unfortunate quarrel among the children of the decedent Katherine Baron over the amounts of two savings accounts and two certificates of deposit. These amounts, all belonging originally to Mrs. Baron, stood just prior to her death, intestate, in her name and that of appellant Janet B. Williams, her oldest child, as "joint tenants with right of survivorship and not as tenants in common." Literally minutes before Mrs. Baron's demise, the amounts on deposit, totalling some $45,000 and representing all of her property, were withdrawn by Mrs. Williams. She asserted she did this on her mother's instructions and claimed the entire sum to the exclusion of the other members of the family.

This suit was brought by the administratrix of Mrs. Baron's estate, another of her daughters, to recover the moneys for distribution as intestate property on equitable grounds, including breach of trust.[1] The Chancery Division held that Mrs. Williams did not establish a sole right thereto and so ordered that all the moneys be paid over to the administratrix.[2] The Appellate Division affirmed in an unreported opinion and we granted certification on Mrs. Williams' petition. 58 *N. J.* 597 (1971).

The determination below rested primarily not on resolution of conflicting proofs, but rather on factual and legal conclusions reached upon consideration and weighing of evi-

[1] All the withdrawn moneys had been deposited in accounts in Mrs. Williams' name alone except the proceeds of one savings account amounting to about $17,000 which had been first placed in a joint account in Mrs. Williams' name and that of a sister, Elizabeth C. Noebels, who was made a defendant by reason thereof. After this suit was started, but before trial, Mrs. Williams removed the sister's name from the account on the advice of her attorney. Mrs. Noebels is therefore not a party to this appeal.

[2] The defendants had counterclaimed for moneys expended for funeral and medical expenses and other debts of the decedent. The trial court directed a credit for these expenditures and the judgment retained jurisdiction in the court, apparently to determine the exact amount of the credit. This aspect of the case is not involved in this appeal.

dence substantially non-contradictory in its important aspects.

Mrs. Baron and her husband had emigrated from Poland and for many years operated a small produce farm in East Brunswick Township. She was a woman of very limited education and apparently could not read or write beyond signing her name. She understood English and spoke it somewhat brokenly. At the time of her death on July 12, 1968, she was 76 years of age. Six children had been born to the couple, five daughters and a son. The girls each married and left home. Mrs. Williams did not marry until she was 35. Until that time she lived at home, although working elsewhere; she turned over her pay to her parents and assisted them in handling their small business affairs. The son, sometime after his marriage, purchased his own farm in Cranbury and the father and mother then apparently gave up farming and came to live with him. Their farm wa allowed to lie fallow. The father died intestate in 1963 and seemingly all of his assets passed to his widow by virtue of joint ownership. She continued to live with her son. The son died in early February 1967, leaving a wife and two minor children. Thereafter, until a month or so before her death, Mrs. Baron still resided in the son's home with her daughter-in-law. Later in February she sold part of the original farm, including the buildings, to her daughter, Elizabeth C. Noebels, for $20,000. (It was with Mrs. Noebels that she went to live shortly before her death.)

At the time of the father's death he and his wife had a joint savings account in the First National Bank of Cranbury which passed to Mrs. Baron by survivorship. On March 1, 1967, the balance was a little more than $8,000. On that date, she asked Mrs. Williams to go with her to the bank. $6,000, part of the Noebels' land purchase proceeds, was deposited in this account and the $14,000 remainder of that sum in a new account designated "special." (Apparently the purpose of opening the second account was to assure maximum federal deposit insurance protection,

then limited to $15,000 per account.) After consultation with a junior bank officer, the new account was opened in the names of, and the name on the first account was changed to, Mrs. Baron or Janet B. Williams "as joint tenants with right of survivorship and not as tenants in common."

Mrs. Williams testified that her mother told her and the officer in the bank that "she wanted the account in both names and specify that no one is to withdraw any money, only she's to handle the account, put in money and take it out but my name was to be on it in case anything should happen to her." The latter phrase was characterized by the witness as meaning to her "if she had gotten sick or something." These instructions were repeated by Mrs. Baron to Mrs. Williams as they were leaving the bank, coupled, as the witness said, with the statement that "if anything happened to my mother, [she] wanted me to have the money." She also claims her mother made the same statement to her on later occasions. Mrs. Williams was clear that her mother did not say to the bank officer that she wanted Mrs. Williams to get and keep the money in the event of her death. In fact, there is no testimony in the case that Mrs. Baron ever expressly said to Mrs. Williams that the latter was to keep the money to the exclusion of the other children upon her death, nor is there anything which directly casts light on what Mrs. Baron intended by the expression that she wanted Mrs. Williams "to have the money." Rather Mrs. Williams said her mother never told her exactly what to do with the money "if anything should happen to her."

The bank officer's testimony as to what transpired on March 1, 1967 and why the highly legalistic format of the accounts was utilized was ambiguous and not helpful. It largely went to a general course of conduct that the instructions of a depositor are followed and the names and characterization of the account placed thereon as requested. She said she could not recollect the specific conversation that was had, but that Mrs. Baron wished to add her daughter's name on the account and after discussing it with her, "I

added the name of her daughter and entered it the way she requested it." She could give no satisfactory explanation for the use of the joint tenancy-survivorship language (which certainly could not have been suggested by Mrs. Baron or Mrs. Williams) and was very unclear as to whether its meaning was explained or even whether the survivorship aspect was discussed at all. (It seems quite unlikely that either occurred to any extent in the light of Mrs. Williams' testimony detailed above as to what her mother told and did not tell the bank officer; the strong probability is that the bank officer, as a lay person, did not appreciate the legal significance of the language used or know how to prepare a proper format to carry out Mrs. Baron's real intention.)

There is no doubt that Mrs. Baron retained the bankbooks until a month or less before she died and handled all transactions herself and without participation by Mrs. Williams. (Some, but not all, of the other children knew the form of the accounts.) The principal transaction followed the sale of the remainder of the farm to another daughter, Jane Baylis, in early June 1968 for $19,000. On June 6 of that year, the receipt of this sum caused a rearrangement of the accounts, which resulted in the issuance of two certificates of deposit in the respective amounts of $14,000 and $13,000, designated in the same form as the savings accounts, and adjustments of the amounts in those accounts so that one contained something over $17,000 and the other about $700, in which amounts they remained until the total withdrawals by Mrs. Williams. Apparently it was shortly after the June 6 transactions that Mrs. Baron moved from her daughter-in-law's home to that of her daughter, Mrs. Noebels. Shortly after the move she handed over the two bankbooks and the certificates of deposit to Mrs. Williams. The record is completely barren as to the reason for the delivery or what Mrs. Baron said at the time. It can be inferred that she was not feeling well since she entered the hospital a short time later.

As has been indicated earlier, Mrs. Williams testified that, while her mother was in the intensive care unit of the hospital, she instructed her, two or three days before death, to withdraw all the money from the bank, saying only "I'm sick now. I don't know when I'm gonna get out. Please take the money out of the bank and put it in your name." The withdrawals followed the next day, minutes before Mrs. Baron died.

To round out the summary of the proofs, it should be noted that there was considerable testimony from various members of the family, other than Mrs. Williams and Mrs. Noebels, as to Mrs. Baron's statements of intention, particularly in the final months of her life, with respect to the disposition of the accounts upon her death. It was said she expressed satisfaction with the sale of the remainder of the farm so that there would be no fighting over it after her death. And she is reported to have stated on several occasions that her money was to be divided equally among all the children and that she did not want any quarreling about it. While there was testimony, perhaps sharpened by bitterness existing at the time of trial, of some friction between the mother and certain family members and among some of the daughters, there was clearly not enough to reach the conclusion that Mrs. Baron would want to favor Mrs. Williams with all her assets to the exclusion of all other family members, absent an express statement of such an intention.

We are concerned here with the rights of the parties named in joint bank deposits, having a designation of survivorship on the pertinent instruments, which were terminated prior to the death of the sole depositor (Mrs. Baron), rather than with the situation which would exist if the accounts had remained until her death. Nonetheless the other party named thereon (Mrs. Williams) seeks somehow to take advantage of the joint bank account provisions added to the banking act in 1954, *L.* 1954, *c.* 209, *N. J. S. A.* 17:9A–218. *See also L.* 1954, *c.* 208, *N. J. S. A.* 46:37–1.

Both the trial court and the Appellate Division held that the 1954 statutory language relied upon was not applicable, because it could come into operation only with respect to the amount remaining in a joint account upon the death of one of the parties named thereon. We agree.

The provision referred to is found in subsection B of *N. J. S. A.* 17:9A–218. Section 218 deals with all joint accounts which by the terminology used have survivorship incidents, no matter what particular form that terminology may take. Subsection B reads:

> When either, or both, or only 1 of the 2 persons in whose names a time or demand deposit account is maintained in any form described in this section, makes a deposit or deposits in such account, or causes a deposit or deposits to be made in such account, such person *shall be conclusively presumed to intend to vest in the other a present beneficial interest in each deposit so made, and in the moneys to the credit of the account from time to time, to the end that, upon the death of the first of the 2 persons to die, all the right and title of the person so dying in and to the moneys to the credit of the account on his death,* less all proper set-offs and charges, *shall, at such death, vest solely and indefeasibly in the survivor.* (Emphasis added)

Clearly, on its face, the statute does not come into play where the account is terminated prior to the death of the first of the two persons to die who had been named thereon. ▉▉ Nor can it be said, as Mrs. Williams urges, that the spirit of the 1954 provisions requires the result that she had acquired the right to the whole of the deposits under the withdrawal circumstances here present. This is made plain by the two leading cases interpreting the section, *Ward v. Marine National Bank,* 38 *N. J.* 132 (1962), and *Bauer v. Crummy,* 56 *N. J.* 400 (1970), especially the latter, which was decided after the instant trial but before the Appellate Division decision. *Bauer* spelled out fully that the purpose of the 1954 statutory changes (*L.* 1954, *c.* 209, *N. J. S. A.* 17:9A–216, –217 and –218) was only to overcome the prior refusal of the courts to give effect to survivorship incidents of a joint account (or an account in

the name of an individual depositor in trust for another, covered by *N. J. S. A.* 17:9A-216, or one payable on the death of an individual depositor to a named person, covered by *N. J. S. A.* 17:9A-217), particularly where the intention of the depositor to make "a poor man's will," but at the same time to retain the sole right to the moneys during his lifetime, was evident. That refusal had been based on the legal reasoning that to give effect to survivorship provisions in such a situation would violate the law of gifts and of wills, which required an *inter vivos* joint tenancy with an equal right of enjoyment in the donee in order to avoid a testamentary disposition on the death of the depositor-donor not established by an instrument executed with the formalities of a will. 56 *N. J.* at 405. The so-called "conclusive presumption" in subsection B is consequently a misnomer; it is not actually a presumption at all. In reality it amounts to a somewhat awkwardly expressed legislative change in the substantive law of gifts and wills to the extent of permitting, by the use of a fiction designated a "conclusive presumption," an intended survivorship to take effect despite the retention by the depositor of full ownership and control during his lifetime. *Bauer* concluded that the 1954 provisions do not control the *inter vivos* rights of the parties or make every joint survivorship account a true joint tenancy from inception, and "hence the depositor may insist, as he could [under prior case law], that the account remained his sole property, and that his purpose was only to achieve a gift to the donee upon the depositor's death." 56 *N. J.* at 410. It certainly follows that *N. J. S. A.* 17:9A-218 subd. B has no application where a joint account had been terminated prior to the death of the depositor.

 Mrs. Williams also contends that this result is inequitable and unjust because, if she had not obeyed her mother's instructions but had allowed the amounts on deposit to remain until after her mother's death, the entire balances would thereupon have vested solely and indefeasibly in her. The claimed result would not follow as of course,

despite the language of *N. J. S. A.* 17:9A–218 subd. B, since *Bauer,* following *Ward,* pointed out that the so-called "beneficiary's claim is open to attack upon equitable grounds such as fraud, duress, undue influence and mistake" (56 *N. J.* at 414), *i. e.,* matters going to the true intent of the depositor. These grounds would include, as here, a breach of trust (analogous to the ground of mistake in the format of the account) based on the claim that the survivorship aspect, no matter what the language used might be, was intended at most only to vest the amounts on deposit on the death of the depositor in the beneficiary as trustee for the purpose of having the proceeds available for distribution among all the family members under the laws of intestacy, *i. e.,* that there was no intention to make "a poor man's will" for the sole benefit of the other party named on the account.

Apart from reliance on *N. J. S. A.* 17:9A–218 subd. B, Mrs. Williams also claimed the withdrawn amounts on the theory of gifts to her by her mother, *inter vivos* or *causa mortis.* (The latter theory was not set forth in the pretrial order; it first appears in the trial court's oral conclusions.) The trial judge held that she had not sustained the burden of proof, by the required degree of clear and convincing evidence,[3] as to either category, because of the lack of proof of the vital element of donative intent at any time from the inception of the accounts to and including the circumstances surrounding the withdrawals. He found, in effect, that throughout Mrs. Baron, not versed in the law and without legal advice, intended to set up and maintain

---

[3] As is said in 5 *New Jersey Practice* (*Clapp, Wills and Administration,* 3d ed. 1962) § 15, p. 62: "The burden of proof that an interest [in a joint bank account] passed to B before A's death, is on the party who raised the issue in his pleadings [Mrs. Williams here]. When the ownership of a bank account is in dispute and the dispute arises in the course of settling a decedent's estate, the controversy may be litigated in an equitable action at the suit of either the executor or administrator or the other claimant." The degree of proof must be clear and convincing, at least where the claim is first asserted after death. *Id.,* §4, p. 16. *See also N. J. S. A.* 2A:81–2.

merely convenience accounts whereby her eldest child, if necessary, could withdraw moneys for Mrs. Baron's needs and purposes and that at no time did she intend that Mrs. Williams have the amount remaining at death as her own. The Appellate Division, correctly approaching the review of a non-jury determination, was of the opinion that there was sufficient credible evidence in the record to justify these conclusions. As a second appellate tribunal, our function is the more limited one of determining whether the Appellate Division was right or wrong in deciding that there was sufficient credible evidence to sustain the trial court's findings. *State v. (Florence) Johnson*, 42 *N. J.* 146, 163 (1964). We are thoroughly convinced that the Appellate Division was right. Indeed, we fail to see how any other result could have fairly been reached under all the evidence and the legitimate inferences therefrom, no matter which party may be said to have had the burden of proof.

We need not repeat the evidence previously outlined. There cannot be the slightest doubt, on Mrs. Williams' own testimony, that, at the time her name was placed on the accounts on March 1, 1967, the joint basis thereof was for the mother's convenience only and that there was no intention or desire at that time to give the daughter any beneficial interest in the accounts or to surrender dominion over them (despite the format used, of which more later). The conclusion that Mrs. Baron intended to retain the sole property is buttressed by her handling of them until shortly before she entered the hospital in July 1968. The legal situation was not changed by the delivery of the bankbooks and certificates to Mrs. Williams then. Since there is no evidence of what was said at the time, there was still no proof of donative intent to make an *inter vivos* gift, which must be irrevocable and unconditional. It is more probable that the items were delivered so that Mrs. Williams could take care of her mother's expenses if the latter became physically unable to do so.

■ Mrs. Baron's instructions on the eve of death to withdraw the moneys and place them in Mrs. Williams' name (assuming they were given, as the trial court did) do not add up, in the light of all the evidence and inferences therefrom, to either a gift *inter vivos* or *causa mortis* made at that time. What was said then, keeping in mind that we have only the testimony of the interested party contrasted with proofs from other members of the family of frequent prior assertions by the deceased party that the moneys were to be equally divided, is much too thin a reed to justify a finding of clear and convincing proof of the required donative intent at that time on either theory. A claim of gift *causa mortis* is viewed even more carefully than one *inter vivos;* it also requires a fixed anticipation of death by the donor, a fact not at all clear here. *See Foster v. Reiss,* 18 *N. J.* 41, 45, 47–48, 53–54 (1955). Why Mrs. Baron asked Mrs. Williams to withdraw the moneys is open to conjecture. In any event, we cannot quarrel with the trial court's finding, upon consideration of all the evidence, that she had no intention on this final occasion that Mrs. Williams keep the entire amount on deposit as her own or with its conclusion that prior statements that Mrs. Williams was to "have the money" did not mean to the exclusion of the other family members, but only for the purpose of paying expenses.

■ Mrs. Williams urges that the trial court erred in imposing upon her the burden of proof of a gift. *See* footnote (3), *supra.* She seeks to base this contention on a claimed common law presumption, mentioned in some cases before the 1954 statute, that, by reason of the format of the account, the alleged donor intended to make a present gift in the account to the 'other person. 5 *New Jersey Practice (Clapp, Wills and Administration,* 3d ed. 1962) § 15, p. 58–59, and cases cited therein. By hypothesis this intention would have to exist at the time the account was opened and apparently would apply to the original and all subsequent deposits. Here the expressed format was a joint tenancy with right of survivorship, which would seemingly mean a

present gift of an undivided one-half interest. Beyond the naked conclusion that the trial court committed "reversible error," she does not spell out, if the contention has merit, what the consequences would be, *i. e.,* new trial, reconsideration of the evidence by the trial court under a different burden of proof, or a judgment in her favor directed by this court either to the whole of the withdrawn amounts or one-half thereof.

The cases dealing with this presumption, its antecedents, development, and circumstances and mechanics of application present the same judicial confusion that existed until the 1954 statute and our interpretative decisions in *Ward* and *Bauer* with respect to the treatment of joint bank accounts generally. No useful purpose will be served by detailed discussion of them at this late date. It seems enough to say that probably the so-called presumption meant little more than that the form of the account is *prima facie* evidence of what it purports to be and will control in the absence of believable evidence to the contrary. See, *e. g., Stiles v. Newschwander,* 140 *N. J. Eq.* 591, 594–595 (E. & A. 1947); *Rush v. Rush,* 138 *N. J. Eq.* 611, 615 (E. & A. 1946); *Goc v. Goc,* 133 *N. J. Eq.* 206, 208 (Ch. 1943), affirmed 134 *N. J. Eq.* 61 (E. & A. 1943); *Steinmetz v. Steinmetz,* 130 *N. J. Eq.* 176, 177 (Ch. 1941); *Morristown Trust Co. v. Capstick,* 90 *N. J. Eq.* 22, 25 (Ch. 1919), affirmed o. b. *Morristown Trust Co. v. Safford,* 91 *N. J. Eq.* 152 (E. & A. 1919).

The rule may well have been developed to enable a court, thoroughly convinced that the depositor intended survivorship in the beneficiary as distinct from a mere convenience account, to give effect to that intention by means of thereby finding a gift of a present interest during lifetime which would make survivorship a non-testamentary disposition and the formalities required by the law of wills unnecessary. What purpose the rule serves since *Bauer* and the present form of the dead man's act (*N. J. S. A.* 2A:81–2) need not be considered here since we are satisfied that, even on the

thesis advanced, it cannot aid Mrs. Williams here and that the trial court properly imposed the burden of proof of a gift upon her.

We say this because the so-called presumption was not only rebutted, but completely demolished, by her own testimony that her mother told her and the bank officer that only she (Mrs. Baron) was to withdraw any money and handle the accounts and, in effect, that she wanted her daughter's name on the accounts for use solely if she became unable to handle her affairs. Nothing can be clearer that that Mrs. Baron did not intend, at the vital time of the opening of the accounts, that her daughter have any present interest therein.

What shines through in this case, as in so many of the welter of decisions in the books concerning joint bank accounts, is the matter of inaccuracy or mistake by lay bank employees in utilizing designations for such accounts by rote and in the routine use by banks of signature cards containing language legally inappropriate to the depositor's actual intent. We are convinced such is really the situation in the instant case. These errors arise because of failure to inquire sufficiently as to that intent or of lack of knowledge of how properly to implement it. A bank, now completely protected by statute as to payment of joint accounts after death, has an obligation to its customers, who so frequently rely solely upon it, to make sure their intent is appropriately evidenced.[4] There is no reason in law or policy why a depositor, desiring only a convenience account during his lifetime, should not be able to have that purpose, and no more, carried out. When the intention is truly to make a "poor man's will," that desire ought to be unmistakably expressed. Intelligent inquiry of the depositor as to desire and purpose must be made in every case. We suggest that when

---

[4]The possibility of a bank's liability in damages if it fails to fulfill that obligation should not be overlooked, although, of course, that is not before us and we are not to be understood as intimating any view upon it.

the intent is only to have a lifetime convenience account, a power of attorney, rather than an account designation, is the suitable method. Note *L. 1971, c.* 373. When the desire is for a convenience purpose during life and payment to another of the amount remaining on deposit at the depositor's death, as the former's sole and entire property, a power of attorney plus the account designation "A, payable on death to B" (*see N. J. S. A.* 17:9A–217) is the most appropriate means. If the depositor desires only survivorship, without convenience aspects during his lifetime, the same designation should be used. Language of joint tenancy, the meaning of which the average depositor and indeed most bank employees do not understand, is to be avoided in such situations. Its use will only be justified when the actual intent is to give the other party named on the account an irrevocable beneficial interest therein from inception. Designations which include "or the survivor" or similar expressions are also undesirable because of the problem of interest in the account during lifetime possibly raised thereby when that is not the depositor's intention.

Brief mention should be made of Mrs. Williams' final contention that if she is not entitled to the full amount of the withdrawn bank moneys, the same should not be divided equally among Mrs. Baron's next of kin, but the shares of certain members of the family should be reduced on the theory of advancements made to them by Mrs. Baron during her lifetime. Reference is apparently directed to allegedly unpaid loans, pecuniary gifts and claimed sales of her real estate at less than full value. The question was not raised until Mrs. Williams' brief in the Appellate Division; it has never been tried out and cannot be passed upon now. If there is any such question legally and factually apposite, and we intimate no opinion thereon, it will have to be raised and determined in proceedings concerning the distribution of the estate.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, PROCTOR, HALL, SCHETTINO and MOUNTAIN—6.

*For reversal*—None.