BONNCO PETROL, INC., PLAINTIFF–APPELLANT, v. GENE
AND MARLENE EPSTEIN, DEFENDANTS–RESPONDENTS.

Argued March 13, 1989—Decided July 13, 1989.

*Melvin S. Narol,* argued the cause for appellant (*Jamieson, Moore, Peskin & Spicer,* attorneys, *Melvin S. Narol* and *John D. McQuarrie, Jr.,* of counsel and on the briefs).

*Jeffry A. Mintz* argued the cause for respondents (*Mesirov, Gelman, Jaffe, Cramer & Jamieson,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal concerns a dispute between the parties to an option agreement over whether they intended the sum of $10,-000, the price of the option, to be credited to the purchase price. The problem arises because after the parties negotiated the contract, the purchaser, Bonnco Petrol, Inc. (Bonnco), and its agent, Marvin Isdaner, the realtor, unilaterally inserted in the option agreement the following clause: "such monies to be applied toward purchase price."

The realtor took the contract to the home of the seller, Mr. Epstein, but did not bring the additional clause to Mr. Epstein's attention. Mr. Epstein signed the contract as it was presented to him by the realtor.

Bonnco informed Epstein of its desire to exercise the option, but Epstein refused to convey the property. Bonnco commenced this action for specific performance. The trial court held that the option agreement was invalid and dismissed Bonnco's complaint for specific performance. The majority of the Appellate Division held that the contract was rescinded but that the $10,000 option payment should be refunded to Bonnco. The dissent in the Appellate Division argued that the contract should be reformed so that the $10,000 would not be credited toward the purchase price and the property conveyed to Bonnco.

Bonnco filed an appeal as of right pursuant to Rule 2:2–1(b), and a petition for certification, which we granted. 113 *N.J.* 637 (1988).

I

The parties met through the efforts of Marvin Isdaner, a real estate salesman. Mr. Epstein had mailed flyers listing the property at issue, together with other properties he owned, to several real estate brokers. At that time Isdaner was actively seeking sites where Bonnco could locate a "Grease Monkey" franchise. Isdaner thought Epstein's property would be a good

location. Initially, Ellen Epstein, Mr. Epstein's daughter, quoted Isdaner a purchase price of $185,000, which Stephen Schmidt, Bonnco's president, rejected as too high. Shortly thereafter, however, Mr. Epstein offered to sell the property for $140,000, a price attractive to Schmidt.

Mr. Epstein, his daughter, Schmidt, and Isdaner had a breakfast meeting on February 16, 1985, to discuss the terms of the transaction. One of the alternatives, presented by Schmidt and rejected by the Epsteins, involved a lengthy and complex agreement of sale drafted by Schmidt's lawyer, which contained numerous contingencies for both financing and governmental approvals and a provision that a $10,000 deposit be credited to the sales price. Mr. Epstein preferred a simple agreement and terms that would allow them to retain title for six more months in order to receive capital gains treatment. The trial court found, notwithstanding Schmidt's profession to the contrary, that such a delay also benefitted Bonnco by allowing it more time to obtain the necessary permits and financing.

Ultimately the parties agreed to an option to purchase the property for $148,500 ($140,000 to be paid to the Epsteins, the remaining sum of $8,500 to be paid to Isdaner as his real estate commission). The option was exercisable after September 1, 1985, but no later than February 28, 1986, for an option price of $10,000. The parties also agreed to enter into a five year lease to commence March 1, 1985. The five-year term, as opposed to a six-month or one-year lease, was chosen to aid Bonnco in obtaining financing. The rent on the lease, $1,590 per month for the first year, was thought to be equivalent to the carrying costs of the property.

Schmidt later testified that he believed the breakfast meeting had included a discussion that the $10,000 would be credited toward the final purchase price, as it would be if it were a down payment on a direct sale. The Epsteins insist that there was no such discussion of a credit. Isdaner does not remember.

At the end of the breakfast meeting, Isdaner offered to draw up the documents. Epstein instructed Isdaner that the option agreement and lease should be drafted like the prior agreements embodied in model option agreements and leases. Epstein gave Isdaner copies of these to follow. These models did not contain provisions crediting the option price to the purchase price. The option and lease drawn up by Isdaner closely followed these models, mentioning no credit. The two documents also contained language referring to each other. The last paragraph of the option agreement reads: "Seller agrees that upon tender of the full $10,000 option price * * * he will enter into a Lease Agreement with the Buyer for the property know as [address]. Said lease agreement is hereby made a part of option agreement attached hereto." Similarly, in the lease there is the clause, "[t]his lease is subject to an option to purchase attached herewith and dated 2/21/85 and hereunder made a part of this lease."

Schmidt was the first to examine the documents, in Isdaner's office, on February 21, 1985, although Epstein testified that Isdaner had earlier read the documents to him over the telephone. Schmidt noticed the absence of any credit provision. While Isdaner does not recall whether he participated in changing the option agreement, Schmidt testified that it was at Isdaner's direction that someone in his office typed the clause, "such monies to be applied toward purchase price," following the terms describing the method of payment of the $10,000. In any event, Schmidt does not deny that he unilaterally changed the contract.

After Schmidt had signed the documents, Isdaner took them to the Epstein's house and waited while Epstein skimmed the documents and signed them for himself and Mrs. Epstein. Isdaner did *not* mention the change in the option agreement. Schmidt paid the $10,000 plus the first month's rent immediately, in accordance with the agreement, and continued to pay rent as required by the lease over the following year.

On the last day that it was permitted to do so, Bonnco sent a letter to the Epsteins stating it intended to exercise the option. Thereafter, there was a round of negotiations between Schmidt and the Epsteins during which time they discussed the possibility of renegotiating the five year lease instead of settling the purchase. During those discussions Bonnco first withdrew its exercise of the option and later renewed it. It was at a meeting at Epstein's home during those negotiations that Schmidt first mentioned that the option agreement provided that the $10,000 be credited to the purchase price. Mr. Epstein expressed great shock and surprise, and immediately reviewed his copy of the option agreement. As a result of his discovery of the credit clause, the Epsteins refused to sell the property, which led to this litigation.

On June 11, 1986, Bonnco filed a complaint, seeking a temporary restraining order to prevent the Epsteins from selling the property to anyone else, and seeking specific performance of the option agreement as it appeared in the contract. In their answer the Epsteins argued that the option agreement was invalid.

The trial court initially granted the restraining order and then dissolved it, ordering the Epsteins to notify the court if they were considering the sale of the property. When the Epsteins so notified the court, having arranged a potential option agreement with another corporation, the trial court held a plenary hearing "limited to proofs concerning negotiations between the parties leading to the Option Agreement and the facts and circumstances surrounding the preparation of the Option and its signing." At that time, Bonnco filed a *lis pendens*.[1]

---

[1]Bonnco has filed two additional *lis pendens* and the Court is advised by defendants' counsel that as of April 5, 1989, the property continues to be held *pendente lite.*

Following a two-and-one-half day hearing, the trial court in a letter opinion concluded that "the parties did not reach a meeting of minds with regard to a key element of the proposed agreement, and hence, no enforceable option exists." Bonnco's complaint was dismissed. The trial court further held that the five year lease was unaffected by its determination.

The trial court made the following relevant factual findings: (1) although Mr. Epstein had insisted at the hearing that the disputed credit provision had been inserted after he signed, Mr. Epstein had in fact overlooked it, or had failed to grasp its meaning, when skimming the documents before signing; (2) Isdaner, who had engaged in no formal business with the Epsteins prior to the transaction with Bonnco, had acted as Bonnco's agent at all times, despite formalities in the agreements providing that the Epsteins pay his commission; and (3) with respect to fraud

Schmidt and Isdaner by failing to point out to Epstein the unilateral change in the option from the sample forms given them by Epstein (sic) and permitting him to sign the instruments without drawing his attention to the change effectively *sub silencio* represented that the option conformed to the understandings reached at the breakfast meeting and to the samples neither of which was true.

The trial court went on to describe Schmidt's actions as "unfair and improper," but appears to have implicitly found that neither Schmidt nor Bonnco perpetrated a positive, willful fraud. In denying plaintiff's motion for reconsideration the trial court held that because the Epsteins had performed all their obligations under the contract they did not have to refund the $10,000 to Bonnco.

Plaintiff appealed, asking the Appellate Division either to enforce the option agreement as written or order the price of the option, $10,000, returned. Plaintiff also argued that if the option agreement were declared void, the lease agreement should likewise be rescinded and the monies paid on the lease returned. At oral argument before the Appellate Division, Bonnco's counsel indicated that Bonnco was willing to abandon

its demand for the $10,000 credit, and suggested the court enforce the agreement without that clause.

The majority of the Appellate Division decided that the option agreement was properly rescinded but that the $10,000 option payment should be returned to Bonnco. The Appellate Division noted that the trial court "did not find that either plaintiff or Isdaner engaged in any fraud in inserting the credit clause in the option agreement." The court agreed that there had been no meeting of the minds, holding that "[w]ithout an agreement, the contract for the option to purchase is voidable by the adversely affected party."

The dissenting judge in the Appellate Division suggested that the option agreement should be enforced as reformed, removing the credit provision, since Bonnco had agreed to relinquish that credit. That judge maintained that to do otherwise would reward the Epsteins' "dereliction in failing to properly review the agreement before signing it," and that reformation would provide the Epsteins with the very agreement for which they claim they bargained.

Neither Appellate Division opinion discussed the status of the lease agreement. In its appeal brief Bonnco argues in favor of the dissent's remedy, and also that the lease payments should be returned, suggesting that this position was implicit in the dissent's reasoning. In its petition for certification, Bonnco argues that the option agreement should be enforced as written, and repeats its lease argument.

II

█ A trial court's findings of fact are binding on an appellate court if supported by adequate and credible evidence. *Rova Farms Resort v. Investors Ins. Co.*, 65 *N.J.* 474, 484 (1974). This is particularly so when, as in this case, the significant evidence is largely testimonial rather than documentary, and the trial court has had the opportunity to observe the witnesses and determine their credibility.

We hold that the trial court's factual findings support a holding that the contract must be rescinded not on the ground of "mutual mistake" but on the ground of equitable fraud. The doctrine of mutual mistake applies when a "mistake was mutual in that both parties were laboring under the *same* misapprehension as to [a] particular, essential fact." *Beachcomber Coins, Inc. v. Boskett,* 166 *N.J.Super.* 442, 446 (App.Div.1979) (emphasis supplied); *accord Kislak Co. v. Byham,* 229 *N.J.Super.* 163, 169 (App.Div.1988).

Sections 152 and 155 of the Second Restatement of Contracts, which treat mutual mistake, explicitly provide that the parties must share the erroneous assumption. Section 152(1) reads:

> Where a *mistake of both parties* at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154. [Emphasis added.]

The illustrations make it clear that the parties must share this erroneous assumption. The illustrations of those cases where rescission is appropriate generally use the language, "both A and B [the contracting parties] believe that ..." Restatement (Second) of Contracts § 152 illustrations 1–6.

Section 155 of the Restatement, which addresses those situations in which reformation based on mutual mistake is appropriate, is even more explicit about the need for the two parties to have shared the mistake:

> Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a *mistake of both parties* as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement, except to the extent that rights of third parties such as good faith purchasers for value will be unfairly affected. [Emphasis added.]

■ New Jersey law also requires for reformation for mutual mistake that the minds of the parties have met and reached a prior existing agreement, which the written document fails to express. *St. Pius X House of Retreats v. The Diocese of Camden,* 88 *N.J.* 571, 579 (1982); *Berkowitz v. Westchester Fire Ins. Co.,* 106 *N.J.Eq.* 238, 241 (E. & A. 1930). In *St. Pius*

*X House of Retreats v. Camden Diocese,* we stated that in the context of situations where a writing inaccurately reflects the parties' agreement or intentions, "mutual mistake requires that *both* parties are in agreement at the time they attempt to reduce their understanding to writing, and the writing fails to express that understanding correctly." 88 *N.J.* at 579. *But cf. Lampley v. Davis Mach. Corp.,* 219 *N.J.Super.* 540 (1987) (a case involving consent to a settlement that flows from the divergent mistaken beliefs of the parties and does seem to stand for the proposition that the same mistake in question need not be shared by both parties).

■ In the instant case, neither party claims they shared a basic erroneous assumption of fact. Likewise, neither argues that the writing inaccurately embodied an earlier agreement they reached. Rather, each party argues that its conflicting view of their earlier agreement must prevail. Bonnco believed it agreed to a credit provision, and the Epsteins believed they did not. The facts, therefore, do not support the conclusion that the contract was based on mutual mistake.

■ They do, however, support the conclusion that the contract must be rescinded on the grounds of equitable fraud. We have distinguished equitable fraud from legal fraud in the following way:

> A misrepresentation amounting to actual legal fraud consists of a material representation of a presently existing or past fact, made with knowledge of its falsity and with the intention that the other party rely thereon, resulting in reliance by that party to his detriment. The elements of scienter, that is, knowledge of the falsity and an intention to obtain an undue advantage therefrom, are not essential if plaintiff seeks to prove that a misrepresentation constituted only equitable fraud. Thus, "[w]hatever would be fraudulent at law will be so in equity; but the equitable doctrine goes farther and includes instances of fraudulent misrepresentations which do not exist in the law." [*Jewish Center of Sussex County v. Whale,* 86 *N.J.* 619, 624–25 (1981) (quoting 3 J. Pomeroy, *A Treatise on Equity Jurisprudence* 421 (5th ed.1941) (citations omitted)).]

Consequently, where, as here, a party seeks only equitable remedies, he or she need meet only the lesser burden; it is not necessary to show scienter. *Id.* at 625.

The standards governing nonfraudulent misrepresentations made by a person who is not a party to an agreement are set out in the Restatement (Second) of Contracts § 164(2), which reads as follows:

> If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by one who is not a party to the transaction upon which the recipient is justified in relying, the contract is voidable by the recipient, unless the other party to the transaction in good faith and without reason to know of the misrepresentation either gives value or relies materially on the transaction.

The protection § 164(2) affords the "other party to the transaction" who is innocent does not extend to "a person who is responsible under the law of agency for the maker's misrepresentation." Restatement of Contracts, *supra*, § 164 comment e.

The standards for equitable fraud have been met in the instant case. As noted, the trial court found that Isdaner acted as Bonnco's agent, which makes the former responsible for the latter's misrepresentation. The trial court also found that Isdaner misrepresented, *sub silentio*, that the agreement signed by the Epsteins conformed with the earlier samples. Silence in the face of an obligation to disclose amounts to equitable fraud. For example, in *Jewish Center, supra*, 86 *N.J.* 619 we held that a defendant who omitted facts about his past (such as a prior mail fraud conviction) from his resume submitted for a position as rabbi had committed equitable fraud warranting rescission of his employment contract. Likewise, in *Berman v. Gurwicz*, 178 *N.J.Super.* 611, 618–19 (Ch.Div.1981), it was held that buyers of condominiums claiming damages for legal fraud would not be barred from seeking relief for failing to examine their agreements if they relied on defendants to prepare accurate documents reflecting their prior understanding. Such reliance, it was held, gives rise to an obligation to disclose.

In addition to establishing a misrepresentation, the defendants have also shown reasonable reliance and materiality of the misrepresentation. A difference of $10,000 in price in a

real-estate-sale agreement for land totalling $140,000 is materi-
al. Similarly, it was not unreasonable for the Epsteins to rely
on Isdaner and the plaintiffs properly to memorialize their prior
understanding with respect to the $10,000 option. *See Berman
v. Gurwicz, supra,* 178 *N.J.Super.* 611; *see also Kero v.
Terminal Constr. Co.* 6 *N.J.* 361, 369 (1951) ("[W]here one
party to an oral agreement entrusts the other with the obli-
gation of reducing it to writing, he has a right to rely upon the
representation that it will be drawn accurately ... in accord-
ance with [their] oral understanding...."). The trial court
found that Isdaner did not present the Epsteins with a written
agreement to sign that mirrored the parties' prior oral under-
standing. Thus, it matters little that they failed to read the
agreement carefully before signing. "One who engages in
fraud ... may not urge that one's victim should have been
more circumspect or astute." *Jewish Center, supra,* 86 *N.J.* at
626 n. 1.

We find, therefore, that equitable fraud has occurred. There
was an inaccurate assertion (in the form of a nondisclosure) as
to a material element of the bargain, on which the Epsteins
justifiably relied. Their reliance was justifiable because they
entrusted the drafting of the documents to Bonnco's agent,
Isdaner.

We must now choose between the remedies of reforma-
tion and rescission. The property in question has increased in
value. As a result, the Epsteins ask to rescind rather than
reform the agreement. Understandably, the plaintiffs are hap-
py to reform the agreement so that while they have no "right"
to credit the $10,000 towards the purchase price, they may still
purchase the property. The Appellate Division majority chose
rescission, while the dissent chose reformation. Both are avail-
able remedies in an action for equitable fraud. *See Enright v.
Lubow,* 202 *N.J.Super.* 58, 72 (App.Div.1985), *certif. den.,* 104
*N.J.* 376 (1986); *Foont–Freedenfeld v. Electro–Protective,* 126
*N.J.Super.* 254, 257 (App.Div.1973), aff'd, 64 *N.J.* 197 (1974);

*Gherardi v. Trenton Bd. of Educ.* 53 *N.J.Super.* 349, 366
(App.Div.1958).

■■■■ The object of equitable remedies such as reformation
and rescission is to restore the parties to the *status quo ante*
and prevent the party who is responsible for the misrepresenta-
tion from gaining a benefit. *Enright v. Lubow, supra,* 202
*N.J.Super.* at 72 (citing W. Keeton, D. Dobbs, R. Keeton, D.
Owen, *Prosser & Keeton* on The Law of Torts § 105, 729 (5
ed. 1984)). In this case Bonnco is the party responsible for the
misrepresentation. Hence, we find that equitable policies are
best served by rescinding rather than reforming the real estate
sales agreement between the parties. We do, however, agree
with the Appellate Division majority that the $10,000 Bonnco
paid for the option should be returned as part of the rescission
remedy.

### III

■■■■ Bonnco argues that the contract and lease agree-
ments were so inextricably bound together, as evidenced by
their references to one another, that if the Court determines
that rescission of the option contract is appropriate, it must also
rescind the lease.[2] The Epsteins argue that they have fulfilled
all the obligations under the lease, that Bonnco has had exclu-
sive right and possession of the property under the lease, that
Bonnco has filed *lis pendens* preventing the sale of the proper-
ty, and that there is no provision in the lease providing that it
shall terminate if the option is not exercised. As a general rule
a contract is not to be partially rescinded. It is true, however,
that a severable transaction may be partially rescinded. *IMO
Development Corp. v. Dow Corning,* 135 *Cal.App.*3d 451, 457,
185 *Cal.Rptr.* 341, 345 (1982); *S. Williston on Contracts*
(3 ed. 1970) § 1525, 618; 17A C.J.S. Contracts § 416 at 508;

---

[2]Bonnco, however, seeks only the return of lease payments made inasmuch
as the Epsteins refused to convey the property.

*accord Ramapo Bank v. Bechtel,* 224 *N.J.Super.* 191, 198–99 n. 3 (App.Div.1988) (if fraud involved in execution of loan guaranty agreement, then trial court must decide whether entire loan agreement or merely guaranty agreement is rescinded); *cf.* Restatement (Second) of Contracts § 383, comment b. (if part performances have been fully performed by one or both parties, party with power of avoidance can avoid rest of contract only).

 The record here is void of evidence regarding the issue of severability. The trial court's hearing was limited to deciding the circumstances surrounding the inclusion of the $10,000 option provision. Its only finding with respect to the lease was as follows: "The lease, which remains binding, however, is not affected by these determinations." Understandably, the trial court did not explore the question of severability. Likewise, neither Appellate Division opinion dealt with the issue.

Accordingly, we remand the case to the trial court to determine if the lease agreement also should be rescinded. On remand, the trial court should look to the intent of the parties to determine whether the agreement should be treated as an entire contract. *See IMO Development Corp., supra,* 135 *Cal.App.*3d at 459, 185 *Cal.Rptr.* at 345. Would the agreement have been made were the parties not under the impression that it would be performed in its entirety? We recognize that the intentions of the parties may not be easily gleaned. Hence, we also encourage the trial court to determine whether it is fair to the parties to deem the agreement severable. *Cf.* Restatement (Second) of Contracts § 240, comment e. (determination of divisibility for purposes of § 383, usually hinges on considerations of fairness).

If the trial court decides to rescind the lease agreement, we leave to its sound discretion the crafting of a remedy that will restore the parties to the *status quo ante* with respect to that segment of their agreement.

In sum, we hold that mutual mistake was inapplicable in the instant case, that equitable fraud has been established, and that the parties' agreement to transfer the defendants' land should be rescinded. We also remand to the trial court on the issue of the rescission of the lease. Accordingly, the judgment of the Appellate Division is affirmed and the cause remanded for further proceedings consistent with this opinion.