58 A.3d 1228

DAN STEPHENSON, PERSONAL REPRESENTATIVE OF ESTATE OF JACK M. MURRAY, PLAINTIFF–RESPONDENT, v. WILLIAM E. SPIEGLE, III, ESQUIRE, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted November 27, 2012—Decided January 31, 2013.

Before Judges FISHER, ALVAREZ and ST. JOHN.

*Fleming & Spiegle, P.C., and Lamarche Law, LLC,* attorneys for appellant (*William E. Spiegle, III,* and *Daury I. Lamarche,* on the brief).

*Briggs Law Office, LLC,* attorneys for respondent (*Norman W. Briggs* and *Elizabeth F. Casey,* on the brief).

The opinion of the court was delivered by

FISHER, P.J.A.D.

On December 19, 2006, Jack M. Murray executed a Will, prepared by defendant William E. Spiegle, III, Esq., leaving his estate to family members or trusts for the benefit of family members. On February 2, 2007, less than two months after executing the Will, Murray appeared at Union State Bank in Naples, Florida, and opened an account, which directed the payment of the balance, upon Murray's death, to a designated beneficiary. Desirous of naming a trust as the beneficiary, Murray was dissuaded by a bank representative because the trust documents were not at hand. Consequently, Murray named "William Spiegle Atty" as the "pay-on-death" beneficiary. When Murray died on December 19, 2007, the account held $143,151.26, approximately one-third of his entire estate.

While marshaling the estate's assets, plaintiff Dan Stephenson, the estate's executor, discovered the Union State account. When inquiries were made, Union State expressed a need to reach out to

defendant. Plaintiff learned nothing more until May 12, 2010, when defendant wrote to advise he was the account's sole beneficiary. Defendant conveyed these further thoughts about the account:

> I have no idea why this account was established. It was established approximately six weeks after [Murray] executed his will in my office, which leads me to believe the intent of this account was clearly to take it outside the estate itself. I have no idea what motivated this action. I was completely unaware that this had occurred. I had not seen nor talked with Jack since the day he left my office December 16, 2006. I can only surmise that something happened on his way to Florida or after he got to Florida for him to take this action.
>
> . . . .
>
> . . . I have looked at this situation from various points of view seeking to fathom the intent of this account. I come back to the only conclusion that I can draw, which is—for whatever reason—he wanted me to have this money.

As a result of defendant's decision to retain the funds, plaintiff commenced this action. He alleged Murray was not competent or that he had made a mistake and, also, that the terms of the account were a product of defendant's undue influence.

Defendant unsuccessfully moved for summary judgment, and the matter proceeded to a trial.

At the conclusion of a bench trial, the Chancery judge rendered thorough findings regarding the account's creation. Viewing the equitable theory that would support relief as somewhat unique, and finding most other potential theories inapplicable, the judge concluded it would be unconscionable to withhold the remedy of rescission and, as a result, declared the estate's entitlement to the funds.

Defendant appeals, arguing:

I. THE RECORD ON THE MOTION FOR SUMMARY JUDGMENT WAS DEVOID OF ANY EVIDENCE TO SUPPORT THE VARIOUS COUNTS IN THE COMPLAINT AND THE MOTION SHOULD HAVE BEEN GRANTED.

 A. No Issue Of Material Fact Existed As To Undue Influence.

 B. No Issue Of Material Fact Existed As To Mistake.

 C. No Issue Of Material Fact Existed As To Conversion.

II. THE COURT'S UNILATERAL MISTAKE DETERMINATION WAS AN ERROR, AND THE PLAINTIFF IS NOT ENTITLED TO RELIEF BECAUSE IT IS PREJUDICIAL TO THE DEFENDANT.

 A. Restitution Is Not An Available Remedy Because It Is Prejudicial To Spiegle.

B. The Trial Court Improperly Relied Upon A Rescission Analysis; However, Even Under That Analysis The Court Erred In Granting Restitution.

C. Spiegle Is Not The Proper Party Against Whom A Claim For Uni-lateral Mistake Can Be Brought.

We find insufficient merit in Point I to warrant discussion in a written opinion. *R.* 2:11–3(e)(1)(E). In rejecting Point II, we affirm the judgment under review substantially for the reasons set forth by the Chancery judge with the following additional comments about the applicable remedy to which plaintiff was entitled.

The judge's findings of fact are based on substantial credible evidence and entitled to our deference. *Brunson v. Affinity Fed. Credit Union,* 199 *N.J.* 381, 397, 972 *A.*2d 1112 (2009); *Rova Farms Resort, Inc. v. Investors Ins. Co.,* 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974). In his comprehensive and thoughtful oral opinion, the Chancery judge found "a variety of reasons" to conclude that Murray did not intend the funds to pass to defendant in his individual capacity. In ascribing to Murray "those impulses which are common to human nature," including a natural desire for the construction of his actions "so as to effectuate those impulses," *In re Estate of Cook,* 44 *N.J.* 1, 6, 206 *A.*2d 865 (1965), the judge rejected as highly unlikely defendant's claim that Murray suddenly decided to convey a substantial portion of his estate to defendant personally instead of Murray's family members,[1] particularly when Murray made a Will that left his entire estate to family members less than two months earlier. In essence, the judge found that Murray made a mistake. As the judge summarized, to conclude that the terms of the bank account were consistent with Murray's actual intentions "just doesn't make any sense."[2]

---

[1] The judge found nothing about Murray's relationship with defendant—largely limited to an attorney-client relationship—to suggest Murray intended to confer such a substantial personal benefit. Indeed, as the quoted portion of defendant's letter suggests, even defendant was surprised and without explanation for Murray's ostensible gift of one-third of the estate.

[2] In the quoted letter, defendant suggested something—such as a rift between Murray and family members—may have occurred after execution of the Will and

That is, the judge found it "virtually inconceivable" that Murray intended to benefit defendant, and that it was only "conceivable" that Murray walked into the bank that day "thinking he was going to establish a trust for someone in his family, or maybe fund a trust that was going to be created in the Will." Murray undoubtedly improvised when a bank representative referred to the absence of the relevant trust documents and decided he would "direct these funds to pass to his estate by designating ... his attorney" as the "pay-on-death" beneficiary. This, according to the judge, was the "only ... explanation that's meaningful."

For these and the other reasons cogently set forth in his oral opinion, the Chancery judge found as fact that the creation of an account in favor of defendant personally was the product of a mistake.

The judge then sought to identify a cause of action that would permit the estate's recovery. He initially considered reformation. The availability of this remedy, however, is largely dependent upon a finding of mutual mistake, *Bonnco Petrol, Inc. v. Epstein,* 115 *N.J.* 599, 608–09, 560 *A.*2d 655 (1989); *Beachcomber Coins, Inc. v. Boskett,* 166 *N.J.Super.* 442, 446, 400 *A.*2d 78 (App.Div. 1979), which the judge did not find because Murray was the only party, other than the neutral bank, engaged in the formation of the account. The mistake the judge endeavored to correct was Murray's "unilateral" mistake and, because no fault could be placed at defendant's doorstep, the principles normally applicable when reformation is sought due to a party's unilateral mistake were viewed by the judge as unavailing to the estate. *See Bonnco, supra,* 115 *N.J.* at 608–09, 560 *A.*2d 655; *St. Pius X House of Retreats v. Diocese of Camden,* 88 *N.J.* 571, 579, 443 *A.*2d 1052 (1982).

---

before or when Murray arrived in Florida shortly after executing the Will. The judge, however, found "nothing in the record to suggest any [such] thing happened."

In the face of this obstacle, the judge searched further for an applicable cause of action to remedy Murray's unilateral mistake. He considered whether it was appropriate to impose a constructive trust. He examined the doctrine of probable intention and the tort of conversion. He also considered plaintiff's claim that defendant had exerted undue influence. The judge ultimately recognized, however, that all these theories require some unconscionable, fraudulent or wrongful conduct on defendant's part, and the record did not permit a determination that defendant had acted inequitably or failed to act when conscience required action. This prompted the judge to conclude that no theory other than rescission based on a unilateral mistake applied.

"Inevitably," to borrow from the author of *Six Characters in Search of an Author*,[3] an equitable cause of action "often constructs itself."[4] Here, the judge ultimately ordered rescission on a theory mainly utilized in other circumstances. Quoting *Villanueva v. Amica Mut. Ins. Co.*, 374 *N.J.Super.* 283, 289–90, 864 *A.2d* 428 (App.Div.2005), the Chancery judge found Murray's mistake was "of so great a consequence" that, despite the absence of wrongful acts or omissions on defendant's part, "to enforce the contract as actually made would be unconscionable."

 We agree rescission was appropriate in this case to remedy the unilateral mistake. In this particular context, plaintiff was not required to show any inequitable conduct on defendant's part. It was only necessary for plaintiff to prove: (1) Murray made a mistake of such consequence that enforcement of the account's express terms would be unconscionable; (2) his mistake

---

[3] *See* www.goodreads.com/author/quotes/7702.Luigi_Pirandello (last visited January 16, 2013).

[4] Indeed, equity jurisprudence evolved as a means of avoiding injustices when meritorious claims failed to fit the rigid causes of action known at law. *See, e.g.,* Judge Kimmelman's foreward to William A. Dreier & Paul A. Rowe, *Guidebook to Chancery Practice in New Jersey* at xi (4th ed. 1997) (observing that "[h]ad the law courts not been so unyielding, there would have been no need for the development of a separate branch of equity law").

was material to the undertaking; (3) the mistake occurred regardless of his exercise of reasonable care under the circumstances; and (4) rescission would not cause serious prejudice to defendant. This is the approach that has been applied when considering whether insurance companies, *see Villanueva, supra,* 374 *N.J.Super.* at 289–90, 864 *A.2d* 428; *see also Hamel v. Allstate Ins. Co.,* 233 *N.J.Super.* 502, 507, 559 *A.2d* 455 (App.Div.1989), and those who bid on public contracts, *see Conduit & Foundation Corp. v. Atlantic City,* 2 *N.J.Super.* 433, 440, 64 *A.2d* 382 (Ch.Div.1949); *see also Intertech Assocs. v. City of Paterson,* 255 *N.J.Super.* 52, 59–60, 604 *A.2d* 628 (App.Div.1992); *Cataldo Constr. Co. v. Cnty. of Essex,* 110 *N.J.Super.* 414, 418–19, 265 *A.2d* 842 (Ch.Div.1970), should be relieved of their good faith unilateral mistakes. We see no reason for refusing to apply these principles in favor of beneficiaries of an elderly individual who tried but failed to establish a valid trust. Because the judge properly recognized that a consideration of these four factors weighed in favor of the relief sought, we conclude that rescission was appropriately awarded.[5]

Other equitable theories, not considered by the Chancery judge, also support the judgment under review.

First, the Chancery judge found Murray's intention in opening the bank account was to either create a trust for the benefit of his heirs or fund the trusts required by his Will. Certainly, as the bank account was crafted, Murray fulfilled neither intent; instead, he mistakenly created a windfall for his attorney. In such an instance, a court of equity may impose a resulting trust and allow the corpus of the failed trust to revert to the settlor. *See In re Voorhees,* 93 *N.J.Super.* 293, 298, 225 *A.2d* 710 (App.Div.1967); *In re Estate of Kovalyshyn,* 136 *N.J.Super.* 40, 45, 343 *A.2d* 852 (Cty.Ct.1975). As explained in *Pedrick v.*

---

[5] We reject any claim of prejudice to defendant. A party's loss of a windfall is not the type of prejudice envisioned by these principles. *Villanueva, supra,* 374 *N.J.Super.* at 290, 864 *A.2d* 428.

*Guar. Trust Co.*, 123 *N.J. Eq.* 395, 400, 197 *A.* 909 (Ch.1938), when "an express trust does fail, in whole or in part, for any reason, the equitable interest automatically returns to the settlor and his successors in interest and the beneficial interest is considered as never having left the settlor." *See* George Bogert and Ronald Chester, *The Law of Trusts and Trustees* § 468 at p. 572 (2005); *Restatement (Third) of Trusts* § 8; *see also Estate of Hann v. Hann*, 614 *N.E.*2d 973, 978 (Ind.App.1993) (imposing a resulting trust on a bank account in light of the parties' mistaken or inadvertent failure to create a right of survivorship).[6] The judge's findings permitted a determination that Murray's intent—to fund the trusts identified in his Will, by opening this account and naming his attorney as beneficiary upon his death—failed, and the funds in the account should have been treated as if they had never left Murray's possession, thereby devolving to his estate. Bogert, *supra*, § 468 at 572–74.

■ Second, the judge was permitted to apply the doctrine of probable intention, which has been used by courts to reform mistaken testamentary dispositions.[7] Here, the judge found that Murray intended the bank account to pass to the beneficiaries of his estate and mistakenly thought designating his attorney as the "pay-on-death" beneficiary would accomplish that. Based on that

---

[6] Although courts have, at times, viewed resulting and constructive trusts as being indistinguishable, the difference is clear. The latter is dependent on a wrongful act, *see, e.g., D'Ippolito v. Castoro*, 51 *N.J.* 584, 589, 242 *A.2d* 617 (1968); *Thompson v. City of Atlantic City*, 386 *N.J.Super.* 359, 376–77, 901 *A.2d* 428 (App.Div.2006), *affirmed as modified*, 190 *N.J.* 359, 921 *A.2d* 427 (2007), whereas the need for the former may innocently arise, *see, e.g., Hann, supra*, 614 *N.E.2d* at 978.

[7] Bank accounts like this are often referred to as "poor man's wills." *See Sadofski v. Williams*, 60 *N.J.* 385, 397–99, 290 *A.2d* 143 (1972); *Lebitz–Freeman v. Lebitz*, 353 *N.J.Super.* 432, 436–37, 803 *A.2d* 156 (App.Div.2002), *appeal dismissed*, 179 *N.J.* 262, 845 *A.2d* 105 (2003). Because the purpose in creating the account is the same as the purpose in creating a Will, it follows that the probable intention doctrine should be applicable not only to the latter but also the former.

finding, the judge was entitled to order rescission of the account or reformation of the account's terms. *See, e.g., In re Estate of Dawson,* 136 *N.J.* 1, 9–10, 641 *A.*2d 1026 (1994); *In re Estate of Burke,* 48 *N.J.* 50, 63–64, 222 *A.*2d 273 (1966).

Although this case did not fit many of the various causes of action applicable when a mistake in the creation of a contract or instrument is made, the judge appropriately granted relief through a common sense and equitable application of rescission principles. Ultimately, the equities—that so heavily preponderated in plaintiff's favor—governed the disposition, and the difficulties in defining the applicable cause of action were not insurmountable, as the experienced Chancery judge recognized. As Chief Judge Cardozo elegantly stated in *Graf v. Hope Bldg. Corp.,* 254 *N.Y.* 1, 171 *N.E.* 884, 888 (1930) (dissenting opinion), "equity will find a way, though many a formula of inaction may seem to bar the path."

Affirmed.