22 N.J. Super. 397 (1952)
92 A.2d 28
HELEN C. VEZZETTI AND MAE HORN AS ADMINISTRATORS OF THE ESTATE OF MARY SHIELDS, DECEASED, PLAINTIFFS-RESPONDENTS,
v.
ANDREW M. SHIELDS AND ROSE SHIELDS, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued August 4, 1952.
Decided November 3, 1952.
*399 Before Judges WAESCHE, FRANCIS and HUGHES.
Mr. J. Raymond Tiffany argued the cause for the plaintiffs-respondents.
Mr. Albert J. Shea argued the cause for the defendants-appellants.
The opinion of the court was delivered by HUGHES, J.S.C. (temporarily assigned).
This appeal is from a judgment rendered in the Chancery Division of the Superior Court in favor of Helen C. Vezzetti and Mae Horn, who sued as administrators of the estate of their mother, Mary Shields, to recover for the benefit of such estate money and bonds of which defendants secured possession in the decedent's lifetime. The defendants-appellants are Andrew M. Shields *400 and Rose Shields, other children of decedent, who are, respectively, aged 53 and 63 years and who had always resided with her in her home. A fifth surviving child, Lillian Neumann, was not a party to the litigation. Mrs. Shields, at about 90 years of age, died intestate on April 13, 1950. Judgment went against Rose Shields for $6,000 and Andrew M. Shields for a sum in excess of $39,000, after allowing him a credit for certain funeral expenses. The appellants challenged the sufficiency of the evidence below to support the court's decision that they had obtained these assets from one toward whom they stood in a confidential and dominant relationship, and had failed to sustain their burden of proving what our courts have said is necessary under the "rule of independent advice." Hall v. Otterson, 52 N.J. Eq. 522 (Ch. 1894), affirmed 53 N.J. Eq. 695 (E. & A. 1895); Post v. Hagan, 71 N.J. Eq. 234 (E. & A. 1907).
The trial developed an evidential picture of a widowed mother whose life was devoted over a great span of years to the able and self-sufficient leadership of her family and home; of a persistent, extreme frugality of daily life that resulted in her accumulation in various banking accounts of more than $46,000; of residence in a close family relationship with defendants until her death; of the leaving of the family home by the daughters who married, but who sustained over ensuing years a close and friendly relationship with their mother; of the mother's gradual deterioration in health signalized by a stroke in 1942, which incapacitated her to a certain extent; of increased sickness and enfeeblement, especially during the last year or two of her life, due in part to a cancerous open ulcer of the breast, which was inoperable because of her advanced age; of her hospitalization for this major ill in 1949 and the unavailing use of deep X-ray therapy thereon; of her discharge from hospital and return to her home but a few months before her death, which was caused immediately by cardio-vascular renal disease, including complications due to the cancer and arteriosclerosis. The medical and other evidence produced by the *401 plaintiffs amply supported the conclusions of the learned court that in this evening of her life her relationship with the children with whom she lived, so changed as to alter the relative positions of their wills and daily being, she becoming dependent upon, and subject to them, and they dominant as to her.
It was in this setting that the defendant Andrew M. Shields so manipulated the monies thus painstakingly accumulated by his mother, as to be in possession or control of all of it at her death, with the exception of bonds of the value of $6,000, which she had turned over to Rose Shields about September 9, 1949. The opinion of the court below describes the mechanics of these transfers: 
"Prior to July 14, 1948, the decedent had accounts in three banks in her sole name, and according to a stipulation in the pretrial order, the banks and the amount which she had on deposit are as follows on the dates given, which are those upon which was made the first transaction with which we are concerned: July 14, 1948, Hudson Trust Company, Hoboken Branch, $6,906.50; September 9, 1949, Hoboken Bank for Savings, $26,106.08; December 1, 1949, Provident Institution for Savings in Jersey City, $13,438.65.
On July 14, 1948, Andrew's name was added to the account No. 13769 at the Hudson Trust Company and he acquired the right to draw upon it. On November 30, 1948, he withdrew the sum of $3,750. and with it purchased ten U.S. Savings Bonds  Series E having maturity value of $500. each. These bonds on his application were inscribed in the name of Andrew Shields or Mrs. Mary Shields. On January 24, 1949, he withdrew the sum of $1,851.96 from the account and on the same date made application for the purchase of two U.S. Savings Bonds  Series E having a maturity value of $1,000. each, for the sum of $1,500. These bonds were inscribed in the name of Andrew M. Shields or Mrs. Mary Shields. This withdrawal closed the account. In January, 1950 he surrendered the bonds just mentioned as well as an additional U.S. Savings Bond  Series E having a maturity value of $1,000. and inscribed in the name of himself or his mother, and received in exchange therefor U.S. Savings Bonds  Series G, one in the denomination of $5,000. and the other of $1,000.
On September 9, 1949, Andrew and the decedent went to the Hoboken Bank for Savings where they transacted business with John Jacob, its chief clerk. Andrew's name was added to account number XXXXXX in his mother's name, and both of them on that occasion signed an *402 agreement with the bank, whereby among other things either or the survivor might draw on the account. Because the decedent signed her name with great difficulty, Mr. Jacobs caused her fingerprints to be placed upon the card. At the same time she transferred from account 169312 to the joint account the balance therein of $7,094.49. She signed the draft for this sum by her mark and her fingerprints appear upon the face of the draft. As the result of this transaction, there was $26,106.08 in the joint account. On the same day Andrew signed a draft on the account for $15,000. and he made application through the said bank for the purchase of U.S. Savings Bonds  Series G in the amount of $9,000. to be inscribed in the name of Mrs. Mary Shields or Andrew M. Shields, and a like application for the purchase of U.S. Savings Bonds  Series E having a maturity value of $8,000. to be inscribed in the name of Mrs. Mary Shields or Miss Rose M. Shields. On the same occasion he withdrew from the joint account the further sum of $1,000. He testified that this sum in cash was given to decedent. Jacob had no recollection as to whom the cash was given. The reason for her taking the sum of $1,000. does not appear.

* * * * * * * *
The decedent signed a draft dated November 18, 1949, drawn on the Provident Institution for Savings in Jersey City and payable to the order of Hoboken Bank for Savings, for the balance of account number XXXXX and interest. This draft was honored and the sum of $13,438.65 was paid to the latter bank on December 1, 1949, which credited it to the joint account of the decedent and Andrew.
On January 10, 1950, Andrew went to the Hoboken Bank for Savings and drew the sum of $12,000. from the joint account and with it purchased through the bank U.S. Savings Bonds  Series G in the amount of $12,000. and requested that the bonds be inscribed in his name. On the same day, he withdrew the balance in the account, namely $11,637.32, opened a new account, number 250923, in the same bank in his sole name and deposited the said sum therein. On February 27, 1950, he withdrew the sum of $7,500. from this account and on the following day opened an account in his name at the Greenwich Savings Bank in New York City with a deposit of $7,500. No further deposits were made by him in his individual account in the Hoboken Bank for Savings, and thereafter he made a number of withdrawals therefrom and closed the account on May 7, 1951. * * *
As some banking transactions of Andrew are definitely related to various steps in this action, these dates should be noted. Summons was served on December 8, 1950, a pretrial conference was held on March 2, 1951, and the trial was commenced on May 10, 1951. On January 10, 1951 he withdrew from his account in the Greenwich Savings Bank the sum of $7,575.37, and on the same day he entered his safe deposit box in the Hudson Trust Company. About this time he obtained a leave of absence from the Erie Railroad Company where *403 he was employed as a barge captain, effective January 15, 1951. He and Rose went to Florida in the middle of January, 1951 and returned about a month later. He resumed his employment on April 9, 1951. On March 1, 1951, he had in his possession U.S. Savings Bonds  Series G in the amount of $27,000. and on that day, which was the day before the pretrial conference, he turned these bonds in for redemption and received cash in the approximate sum of $27,000. The records of the Hudson Trust Company show that he entered his safe deposit box there on March 13, 1951. On May 7, 1951, three days before the trial commenced, he withdrew from his individual account in the Hoboken Bank for Savings the sum of $749.37. This withdrawal closed the account. The records show that he entered his safe deposit box at the Hudson Trust Company on May 9th."
These extraordinary circumstances of themselves are indicative of an abandonment of will on the part of this hitherto strong and self-sufficient mother, although there is no indication in the proofs of incompetence on her part, but on the contrary some evidence, at least as observed by one or more of the bank officials, that she "understood what she was doing." The whole of the plaintiffs' proofs were ample to establish the terminal finding of the court, namely, that she was dependent upon and subject to the recipients of this control of her property, which constituted all her worldly goods, and that they were dominant as to her.
The defendants sought to rationalize the conduct of their mother in cooperating in these surrenders by evidence of her stated reasons for doing so. By conversations with her which are essentially uncorroborated, they emphasize her wish that her married daughters have none of her property, and Andrew M. Shields elaborates by quoting his mother as directing him to "spend the money"; "do what you please with it." With regard to the decisions to change cash into bonds, or like transactions, he quotes his mother as saying "do what you want," and "do whatever you think is best." Rose Shields, in describing the occasion in September 1949 when her mother handed to her bonds of $6,000, quoted her mother as saying, "Rose, here is a bond for you. Go and put some clothes on your back," and again, "spend it." This *404 evidence, if believed, adds support to the theory that the mother was dependent and subject in her will, and these favored children were correspondingly dominant toward her.
The defendant Andrew M. Shields added to the pattern of his testimony, statements of his mother's ill feeling toward the plaintiffs, and her purpose that they not share in her estate. In support of his incredible story that she recommended to him a course of profligacy as to this money, he boldly testified that the money so passing into his control was intact at the time of his mother's death and that in the short interval before the trial he had almost entirely dissipated it. His testimony was brazen and false:
"By the Court:
Q. In the last year you have disposed of forty thousand dollars?
A. Yes, sir; following my mother's orders.
By Mr. Tiffany:
Q. What orders? A. My mother's orders.
Q. What orders? A. To spend it.
Q. She told you to spend it? A. Yes, sir.
Q. How did you spend it? A. Race-horsing.
Q. Whereabout? A. Hialeah, Belmont, Jamaica. All over.
Q. You have no bank accounts, no other bonds, except these?
A. No, sir. I got a bank account of fifteen dollars in New York.

* * * * * * * *
Q. Now, what did you do with $26,000 worth of bonds? A. I spent it.
Q. How and where? A. I spent it.
Q. Where? A. Paid my debts.
Q. What debts? A. Funeral debts.
Q. You had paid that before? A. Well, it could be then I went down to the race track.
Q. What race track? A. Every one that was open.
Q. Which one was open? A. Over in New York there were two open, and when New York was closed I went down to Monmouth.
Q. I am talking about after March 1, 1951; what race track did you go to? A. You write the Racing Commission."
In the face of this testimony the learned court below would have been amply justified in disbelieving every part of the evidence given by Andrew Shields, and it is primarily upon that evidence that the defendants base their denial of that dominant relationship and the dependence of their *405 mother upon them, upon which the plaintiffs predicate their cause of action.
Our rules of court provide in part that "On a review of any cause involving issues of fact not determined by the verdict of a jury, * * * due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Rule 1:2-20. And with respect to the somewhat similar federal rule 52(a) it is thought that adherence to this rule is especially appropriate in the case of an evidential field of long-past transactions, motives and purposes, the effect of which depends largely on the credibility of witnesses. United States v. Oregon State Medical Society, 343 U.S. 326, 72 S.Ct. 690, 96 L.Ed. ___ (1952). On the record before us, indeed, this visual observation of the witness would seem unnecessary to support the disbelief of the learned trial judge in the evidence given by Andrew M. Shields, for its very nature condemns it. We confirm his determination of the facts, and find that they are sufficient to justify his refusal to dismiss the action, and to support the judgment rendered, and indeed, do not see how a contrary view would have been possible.
While it is true that the mere existence of family ties does not create such a confidential relationship that a conveyance between relatives will be invalidated merely because of their consanguinity, where there is not sufficient proof to establish dominance by the grantee over the grantor or any showing of undue influence (Eisenberg v. Finston, 18 N.J. Super. 458 (App. Div. 1952)), an altogether different rule applies where, as here, such dominance does exist. In such case, where the disposal of the property is improvident and where such dominance springs from a confidential relationship, the question of undue influence is not required to be established by proof. In Matthews v. Craven, 124 N.J. Eq. 455 (Ch. 1938), it was held that "It is unnecessary to consider the question of undue influence as it is obvious that a confidential relationship existed at the time of this transfer, and that the defendant was the dominant personality."
*406 In Stroming v. Stroming, 12 N.J. Super. 217 (App. Div. 1951), it is suggested that a confidential relation is not confined to any specific association of the parties, but that its essentials are a reposed confidence and the dominant and controlling position of the beneficiary of the transaction. It is emphasized that the dominance is of the mind and that the dependence must be upon the mind rather than upon the hands and feet of the donee. Chandler v. Hardgrove, 124 N.J. Eq. 516 (Ch. 1938). It exists where the circumstances make it clear that the parties do not deal on equal terms, but that on the one side there is an overmastering influence and on the other weakness, dependence or trust justifiably reposed. Croker v. Clegg, 123 N.J. Eq. 332 (E. & A. 1938).
When a person under the influence of and dependent upon another makes an improvident gift to the other, stripping himself of virtually all of his assets, a presumption of undue influence will arise from the facts and the gift will be declared invalid unless the donor has had the benefit of competent and disinterested counsel and it is shown that he fully understood and intended the consequences of his act. Moreover, when the donee is the dominant party in the relationship, the burden is upon him to show by clear and convincing proof that the gift was a voluntary and intelligent act of the donor. And where a person, enfeebled in mind by age or disease and so placed as to be likely to be subjected to the influence of another, makes a voluntary disposition of property in favor of that person, the burden is upon the recipient to prove the donor understood the nature of the act and that it was not done through the influence of the donee. Haydock v. Haydock, 34 N.J. Eq. 570 (E. & A. 1881); Slack v. Rees, 66 N.J. Eq. 447 (E. & A. 1904); Hall v. Otterson, supra; Post v. Hagan, supra.
In the instant case there was not a scintilla of evidence as to any independent advice available to or received by Mrs. Shields. The failure of the defendants to fulfill their burden of establishing the validity of these transfers by a showing of *407 independent advice to their mother in making them possible is apparent.
Accordingly, the judgment of the Chancery Division is affirmed.