731 A.2d 95

IN THE MATTER OF THE ESTATE OF PETRONELLA PENNA.

Superior Court of New Jersey
Appellate Division

Argued June 16, 1999—Decided June 29, 1999.

Before Judges KING, WALLACE and NEWMAN.

*Joseph R. Armenti* argued the cause for plaintiff-appellant Maria Stuart (*Joseph R. Armenti & Associates*, attorneys; *Mr. Armenti*, on the brief).

*Paul Mainardi* argued the cause for defendant-respondent Erika Muellner (*Brown & Connery*, attorneys; *Mr. Mainardi* and *Stephanie E. Nolan,* on the brief).

The opinion of the court was delivered by

NEWMAN, J.A.D.

This appeal presents a challenge to a joint survivorship mother-daughter account under the Multiple–Party Deposit Account Act, *N.J.S.A.* 17:16I–1 to –17 (the Act), whereby a rebuttable presumption of survivorship is established. Because of the confidential relationship between the mother-daughter, the surviving daughter, in order to claim entitlement to the account, must show that the creation of the joint account was free of undue influence and intended as an *inter vivos* gift. If the daughter fails to do so, a joint survivorship account has not been validly created and the provisions of the Act are inapplicable. If, however, the daughter carries the burden of proof, the Act controls and the party challenging the joint account may still attempt to rebut the presumption of survivorship by, among other evidence, relying on proofs used on the issue of undue influence. In addition to not applying the correct standard for an undue influence attack on an *inter vivos* gift, the trial judge took a too limited view of the proofs to be considered in an effort to rebut the presumption of survivorship under the Act. We, therefore, reverse and remand for a new trial.

## I.

Plaintiff, Maria Stuart, and defendant, Erika Muellner, are two of three surviving children of the decedent, Petronella Penna, who died on March 12, 1997, at the age of ninety one. Decedent was also survived by her son Manfred Szabries, and eleven grandchildren. Under the terms of her will, dated July 12, 1996, each grandchild was bequeathed $1000 and the remainder of her real and personal property, including her house in Florida, her savings

and checking accounts, and her jewelry, was to be divided equally among her three children.

Penna and her children moved to the United States in 1952. Penna's first language was Lithuanian and her second German. She was not fluent in English and her children often translated for her when she was conducting banking or legal business; they also helped her read her mail and pay her bills.

Penna lived in New Jersey until 1977, when she moved to Florida, near her son's home. At that time, she borrowed $20,000 from defendant for a down payment on the house she bought in Florida, a loan that was to be repaid as soon as Penna's house in Pennsauken was sold. According to Penna's son, defendant told him that the loan had been repaid long ago. However, at trial defendant testified that Penna did not repay the loan until 1991, when her mother put the money in a joint account Certificate of Deposit (CD) for her.

In 1996, Penna returned to New Jersey, where she divided her time between living with plaintiff and defendant. In July 1996, defendant accompanied Penna to the law office of Charles Block, who prepared a new will for Penna. An earlier will had been prepared in 1992 by Albert Olizi, plaintiff's son-in-law. Block testified that defendant had to translate certain words for her mother. He also testified that he put standard language in the will regarding the equal distribution of Penna's savings and checking accounts, but it was his understanding through defendant's translation that Penna was going to take care of her bank accounts and CDs on her own.

During Penna's years in Florida, her money was held in New Jersey banks and defendant did her banking for her. Penna told her son that the reason for the arrangement was, according to defendant, the better banking rates in New Jersey. At trial, a representative of Interboro Savings Bank, one of the banks in which Penna held accounts, testified about various withdrawals by defendant from accounts titled "Petronella Penna or Erika Muellner." Between 1981 and 1989, the withdrawals totaled approxi-

mately $137,910. According to the representative, most funds that were withdrawn were transferred into CDs.

The bank representative also testified about the retitling of several CDs ("POD accounts") between 1989 and 1996 from "Petronella Penna payable on death to Erika Muellner" to "Petronella Penna or Erika Muellner." The first title transfer of a CD, from "Petronella Penna individually" to "Petronella Penna or Erika Muellner," occurred in 1978. According to defendant, the title changes were made on the advice of a bank teller, who told defendant and her mother that it would be easier to redeem the CDs that way.

Three CDs worth approximately $26,000, $40,000, and $58,000, were jointly owned by Penna and defendant and were the focus of the trial. According to Penna's son, after Penna's death defendant originally told him that she intended to deposit the CDs in the estate account, but later changed her mind upon receiving "advice." She told her brother that he would get his share of the estate, but she did not want plaintiff to have any of the money because plaintiff had not treated their mother well. At trial, defendant testified that she had considered sharing the money with her siblings, but changed her mind due to the litigation.

Penna's son testified about his mother's generosity to all of her children. Referring to one example, she gave each of them a $10,000 CD before her death, and she refused to let him repay about $18,000 that she had loaned him when he was disabled and unable to work.

The trial judge granted defendant's motion for a directed verdict, finding that plaintiff failed to prove that Penna had not intended to create joint accounts when she retitled her CDs, as required under the Act, N.J.S.A. 17:16I–5(a). He also ruled that, although there was a confidential relationship between defendant and her mother, plaintiff had the burden of proving that defendant exerted undue influence on her mother when she was setting up the joint accounts and CDs. The trial judge determined that no fact-finder could conclude on the basis of the evidence presented

that Penna's volition had been destroyed and that she had no control over her financial affairs.

On appeal, plaintiff's primary argument is that the trial judge erred in applying the Act to this case, which resulted in a high burden of proof for plaintiff. Under the Act, plaintiff had to show by clear and convincing evidence that, at the time Penna created the joint accounts, she did not intend them to include a right of survivorship. Instead, plaintiff contends, the judge should have analyzed this as a case of undue influence in the creation of *inter vivos* gifts. Given the confidential nature of the relationship between defendant and her mother, the burden of proof should have been placed on defendant to show that she did not exert undue influence on her mother and that her mother understood the legal effect of creating joint accounts. In the alternative, plaintiff asserts that even if the Act applies, she proved by clear and convincing evidence that Penna did not intend to create joint accounts at the time they were opened.

Plaintiff also argues that the trial judge erred in not admitting certain exhibits into evidence, in not removing defendant as a co-executrix of Penna's estate, and in failing to compel the accounting by defendant of the assets jointly held by defendant and Penna. Because we are satisfied that the first issue requires a reversal and new trial, we briefly discuss the other issues for guidance on any retrial.

## II.

Plaintiff contends that, notwithstanding the Act, since she proved the existence of a confidential relationship between defendant and Penna, the trial judge erred in placing the burden on plaintiff to prove that defendant exerted undue influence on Penna in creating the joint bank accounts and CDs. Defendant should have had the burden of proving that the joint survivorship accounts were a product of Penna's free will. We agree.

The trial judge held that the Act applied to the joint savings accounts and CDs at issue, despite a very similar case, *Bronson v.*

*Bronson,* 218 *N.J.Super.* 389, 527 *A.*2d 943 (App.Div.1987), decided after the Act went into effect in 1979, which made no reference to the Act. In *Bronson,* two brothers were beneficiaries under the will of their late mother. The mother relied on defendant in connection with her financial affairs and lived with him during the last five months of her life, when she was dying of cancer. *Id.* at 391, 527 *A.*2d 943. Before she moved into his house, she put about $25,000 worth of assets into joint checking and CD accounts with defendant. *Id.* at 391–92, 527 *A.*2d 943. After she moved in with him, she transferred $190,000 in stock into their joint names. *Ibid.* This court relied on the principles described in *In re Dodge,* 50 *N.J.* 192, 227–28, 234 *A.*2d 65 (1967): Where parties enjoy a relationship in which confidence is naturally inspired or reasonably exists, the person who has gained an advantage due to that confidence has the burden of proving that no undue influence was used to gain that advantage. *Bronson, supra,* 218 *N.J.Super.* at 392, 527 *A.*2d 943. The purpose of the doctrine is to afford donors protection against their voluntary actions, the import of which they may not have fully understood. *Ibid.*

We held that the trial judge should not have dismissed the action at the close of plaintiff's case because, accepting as true all of the evidence and all reasonable inferences, he could have concluded that a confidential relationship existed between defendant and his mother; he assisted her in her financial affairs, she lived in his home, and she was dependent on him during her illness. *Id.* at 393, 527 *A.*2d 943. Thus, defendant had the burden of showing that he did not use undue influence and that his mother understood the legal effect of the transfer of assets into joint accounts, that her assets would pass to defendant rather than in accordance with the terms of her will. *Id.* at 394, 527 *A.*2d 943. We noted that "joint accounts are sometimes ... used as 'convenience accounts,' so that another party may more easily handle the financial affairs of the true owner of the asset." *Ibid.* In our remand, we pointed out that defendant had the burden of showing that his mother intended to make a gift to him through the

transfers and that she acted without undue influence. *Id.* at 395, 527 *A.*2d 943.

In a similar case, *Pascale v. Pascale,* 113 *N.J.* 20, 549 *A.*2d 782 (1988), the Supreme Court found a confidential relationship to exist between a father and son when the father transferred stock and real estate to his son, but said that the presumption of undue influence had been rebutted by evidence showing the father to be "an experienced and shrewd businessman who ... completed a transaction that was consistent with his previously-expressed intention and with his last will and testament." *Id.* at 39, 549 *A.*2d 782.

Here, Penna gave defendant control over her banking during the nineteen years that she lived in Florida, despite the fact that her son lived nearby and helped her with other matters. In the last year of her life, when she was ninety years old, she moved in with defendant, although she appears to have split her time with both plaintiff and defendant. The mother-daughter relationship, as well as the trust she placed in her, lead to the conclusion that a confidential relationship existed between defendant and Penna. Indeed, the trial judge so concluded.

However, the trial judge went on to follow the undue influence analysis applied to a will in *Haynes v. First Nat'l State Bank of N.J.,* 87 *N.J.* 163, 432 *A.*2d 890 (1981). In that context, in order to raise a presumption of undue influence, the evidence must show not only a confidential relationship, but also "suspicious circumstances" surrounding the execution of the will. *Id.* at 176–77, 432 *A.*2d 890. However, in *Bronson, supra,* 218 *N.J.Super.* at 394, 527 *A.*2d 943, we were careful to point out the difference between a claim of undue influence in cases involving *inter vivos* transfers and those involving wills: In *inter vivos* transfer cases, where one is giving away what one can still enjoy, the presumption of undue influence is raised more easily than in cases involving wills. All that is needed is a confidential relationship. *Ibid.*

Here, the creation of joint accounts was an *inter vivos* gift. The trial judge should have shifted the burden of proof to defendant

once he concluded that a confidential relationship existed between defendant and Penna. Instead, he searched for evidence of suspicious circumstances surrounding the transfers of the CDs from POD to joint accounts and found none. If he had analyzed under the proper standard, as articulated in *Bronson* and *Pascale,* he would have shifted to defendant the burden of proving that she exerted no undue influence on her mother when creating the joint accounts and that her mother understood the legal effect of those joint accounts; namely, that defendant would receive most of Penna's assets upon her death, a result contrary to the wishes expressed in her will.

■ Under the Act, during the lifetime of all parties, a joint account belongs to the parties "in proportion to the net contributions by each to the sums on deposit," unless the terms of the contract indicate a contrary intent or there is clear and convincing evidence of a different intent at the time the account was created. *N.J.S.A.* 17:16I–4(a). During her lifetime Penna owned all of the money in the accounts and CDs at issue because she deposited all of the money contributed to them.

■ However, when a party to a joint account dies, there is a rebuttable presumption that a right to survivorship was created. *N.J.S.A.* 17:16I–5(a) provides:

> Sums remaining on deposit at the death of a party to a joint account belong to the surviving party or parties as against the estate of the decedent *unless there is clear and convincing evidence of a different intention at the time the account is created.*
> [ (Emphasis added).]

Although the Act went into effect in 1980, our courts have not analyzed *inter vivos* gifts in the context of the Act. However, since the statute was adapted from the Uniform Probate Code,[1] Assembly Judiciary, Law, Public Safety and Defense Committee State-

---

1 "Sums remaining on deposit at the death of a party to a joint account belong to the surviving party or parties as against the estate of the decedent unless there is clear and convincing evidence of a different intention at the time the account is created." Uniform Probate Code § 6–104(a) (amended 1989), 8 *U.L.A.* 467 (1998).

ment, Assembly No. 1626, *L.* 1979, *c.* 491, case law from other jurisdictions that have adopted the Probate Code provision are instructive.

Courts have allowed parties to overcome the statutory presumption with evidence showing that undue influence was used in the creation of the joint accounts, or that the accounts were for the convenience of the depositor. *See In re Estate of Wenzel–Mosset,* 575 *N.W.*2d 425, 430–31 (N.D.1998) (recognizing that a finding of a confidential relationship creates a presumption of undue influence against bank account holder); *In re Estate of Dinnetz,* 532 *N.W.*2d 672, 674–75 (N.D.1995) (holding that statutory presumption that joint bank account is survivorship arrangement does not apply where presumption of undue influence is not rebutted thus rendering the account invalid); *In re Estate of Lienemann,* 222 *Neb.* 169, 382 *N.W.*2d 595, 601 (1986) (concluding that intent of individual creating and funding account is relevant in determining whether there is a presumption of survivorship under statute); *Brezinski v. Brezinski,* 94 *A.D.*2d 969, 463 *N.Y.S.*2d 975, 976–77 (1983) (noting that claimant has burden of proof to show that depositor understood implications of transaction and intended to make a gift where presumption of survivorship is rebutted with evidence that depositor was elderly and had a fiduciary relationship with claimant).

Other courts have taken a more rigid approach, requiring proof of the depositor's intent at the time of creation of the accounts despite the fact that this makes it extremely difficult for the estate to rebut the presumption of survivorship. *See In re Estate of Combee,* 601 *So.*2d 1165, 1169 (Fla.1992) (determining that statute providing presumption of survivorship eliminated need to prove creation of *inter vivos* gift); *In re Estate of Cullmann,* 169 *Mich.App.* 778, 426 *N.W.*2d 811, 815 (1988) (concluding that evidence of depositor's intent or state of mind after she had created joint account was irrelevant to her state of mind or intent at time account was opened and did not rebut presumption of survivorship); *In re Estate of Heske,* 436 *Pa.Super.* 63, 647 *A.*2d 243, 244–

45 (1994) (holding that legatee failed to present clear and convincing evidence to overcome presumption of survivorship).

■ In 1987, this court was still analyzing *inter vivos* gifts using undue influence principles, *Bronson, supra,* 218 *N.J.Super.* at 391, 527 *A.*2d 943, despite the Act. There is no reason to assume that we would follow the rigid approach; nor is there any legislative statement that evinces such a purpose. We are persuaded that the best approach is the flexible one used in North Dakota, in which the court first looked at whether the joint accounts were validly created by determining whether undue influence was exerted by the surviving account holder. *Dinnetz, supra,* 532 *N.W.*2d at 675. Even if no undue influence is found, a trial judge should still be free to look at all the direct and circumstantial evidence available to determine whether the depositor intended to create survivorship rights.

■ Following that approach here leads inescapably to the conclusion that the trial judge's dismissal of plaintiff's case must be reversed. The trial judge assumed that the CDs and joint account contracts at issue included the right of survivorship, although there was no evidence presented as to the language on the signature cards or the CDs. He added that there was no evidence presented that Penna did not intend to create the right of survivorship at the time she retitled the accounts from POD to joint accounts:

> The question presented to the Court, or at least in the Court's mind, was well, what was the conduct of the defendant at the time of that transfer, or those transfers [from POD to joint account]? ...
>
> ... *There's no evidence, at the point of time that the P.O.D.s were changed to joint accounts, about the conduct of the defendant. Don't forget, you're saying this defendant has committed some horrible act.* Well, what did she do? I don't know yet. I know Penna changed it.
>
> [ (emphasis added).]

We disagree with the trial judge's reasoning. First, he looked only at the retitling of CDs from POD to joint accounts, when he should have viewed the creation of all joint accounts at issue, including the savings account. Second, instead of concentrating

on defendant's conduct, he should have focused on the evidence illuminating Penna's intent. By looking at defendant's conduct, the trial judge appeared to conflate the issues of undue influence in the wills context and intent under the Act. Under the Act, there was no need to prove that defendant "committed some horrible act"; rather, the judge should have looked solely at what Penna intended when she created the joint accounts.

The only testimony on the actual creation of the accounts was the retitling of CDs from POD to joint accounts. Defendant testified that a bank teller told her and Penna that it would be easier to redeem the CDs as joint accounts. By that the teller must have meant during Penna's life, because under either title the accounts would become payable to defendant after Penna's death. However, under *N.J.S.A.* 17:16I–4(a), the joint accounts were legally owned entirely by Penna during her lifetime because she contributed all the money deposited into them.

Despite the dearth of testimony on the actual creation or retitling of the accounts, there was circumstantial evidence from which the judge could have deduced the reason for opening the joint accounts. The joint accounts were created, or retitled, starting in 1978, a year after Penna moved to Florida, and continuing through 1996, when she moved back to New Jersey. Penna's son testified that during the nineteen years that Penna lived in Florida she conducted her banking in New Jersey due to the more favorable rates. It was defendant who took care of her mother's banking affairs in New Jersey during those years. Thus, it made sense to have Penna's accounts titled as joint accounts, although in fact a power of attorney would have been more appropriate, as the Court concluded in *Sadofski v. Williams,* 60 *N.J.* 385, 400, 290 *A.*2d 143 (1972).

Moreover, there was evidence of Penna's evenhanded treatment of her three children. Penna's son testified to the three CDs for $10,000 that Penna bought for her children before her death. Similarly, Penna's will, which distributed her assets equally between her three children, evinces an intent to treat her children

equally. Her 1992 will also provided for equal distribution. In addition, Penna named her daughters, both of whom lived in New Jersey, where the will was probated, as co-executrixes of her estate. An established pattern of equal treatment to the three children runs counter to the assumption that Penna intended to give one child well over $100,000 and leave the estate with minimal assets to be divided among the three children.

Accepting all of plaintiff's proofs as true and all of the legitimate inferences that can be deduced from those proofs as we must on a directed verdict motion, *Dolson v. Anastasia*, 55 *N.J.* 2, 5–6, 258 *A.*2d 706 (1969), we are satisfied that the trial judge was mistaken in holding that there was no evidence tending to rebut the statutory presumption of survivorship. [Sections III, IV and V of this opinion have been redacted for publication purposes. *See R.* 1:36–3.]

Reversed and remanded for a new trial.