918 A.2d 649 (2007)
391 N.J. Super. 390
ESTATE OF Calvert OSTLUND, Sr., Plaintiff-Appellant,
v.
Calvert OSTLUND, Jr., Steven C. Ostlund, and Christine O. Roberts, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued January 18, 2007.
Decided March 23, 2007.
*651 Jaime A. O'Brien argued the cause for appellant (Bourne, Noll & Kenyon, attorneys; Ms. O'Brien and Edwin R. Matthews, Summit, on the brief).
David Golub, Wayne, argued the cause for respondent (Williams, Caliri, Miller & Otley, attorneys; Mr. Golub and Eric J. Szoke, on the brief).
Before Judges STERN, COLLESTER and LYONS.
The opinion of the court was delivered by
LYONS, J.S.C. (temporarily assigned).
This case concerns the disposition of a joint bank account on the death of one of the parties to the account and the right to certain checks payable to decedent that were deposited to the joint account after decedent's death. Plaintiff, the Estate of Calvert Ostlund, Sr. (the "Estate"), appeals a judgment, finding that the balance of a joint account (the "account") established by decedent, Calvert Ostlund, Sr. (the "decedent"), and a number of checks payable to decedent and deposited by one of the defendants, Calvert Ostlund, Jr. ("Junior"), after the death of the decedent are the property of Junior.
Plaintiff claims that the funds in the account should have been property of the Estate to be equally distributed between decedent's five children and stepchildren according to decedent's will. Defendants submit that the account gave a right of survivorship to Junior and that at decedent's death, the account belonged to him exclusively.
The following factual and procedural history is relevant to our consideration of the issues advanced on appeal.
At the time of his death, decedent left three biological children, Junior, Steven C. Ostlund, and Christine O. Roberts, (the "defendants"). He also left two stepchildren, Abbey Clements and Justin Waldstein from a marriage to his second wife, Barbara. At the time of his death, decedent resided alone in New York City, New York.
During his lifetime, decedent founded Cal Ostlund, Inc., a business in Kenilworth. Ownership of this business was transferred to Junior in 1989, although he continued to receive a salary from the company and frequently worked there.
Decedent created his last will and testament on February 13, 1995. Codicils dated December 28, 1996 and October 10, 1998 were subsequently executed by decedent, implementing a testamentary plan wherein decedent's estate would be left to his three biological children and his two stepchildren, in equal shares. The testamentary documents were reviewed by decedent's New York estate attorney, Stanley Gilbert, for purposes of drafting the second codicil.
Decedent's will was reciprocal with the will of his wife, Barbara, who predeceased him in 1999. At the time of her death and as a result of a meeting with Gilbert, J.P. Morgan Chase representatives, Junior, and decedent's accountants, decedent disclaimed his right to take under her will, *652 allowing all five children to inherit from her will equally.
On September 8, 1999, decedent opened the account with First Union Bank in his own name as sole depositor under account number XXXXXXXXXX. On May 3, 2001, decedent added Junior's name to the account. It is this account that is in dispute. At the time of decedent's death, the account had a value of approximately $323,847. During his life, funds from the account were used to pay decedent's daily expenses.
Decedent died on May 16, 2003 at seventy-seven years of age. Twelve days after decedent's death, the following eight checks totaling $53,559.78 were deposited into the account by Junior as opposed to delivering them to J.P. Morgan Chase, the executor of decedent's estate:
1. Social security check made payable to Calvert Ostlund, Sr. in the sum of $1,925 representing April 2003 payment;
2. Check from Cal Ostlund, Inc. made payable to Calvert A. Ostlund, Sr., dated April 30, 2003 in the sum of $4,077.78;
3. Federal income tax refund check payable to Calvert Ostlund dated April 25, 2003 in the sum of $33,661;
4. State of New York Income Tax Refund check payable to Calvert Ostlund, Sr. dated May 2, 2003 in the sum of $2,539;
5. State of New Jersey Income Tax Refund check payable to Calvert Ostlund, Sr. dated May 1, 2003 in the sum of $1,122;
6. Social security check made payable to Calvert Ostlund, Sr. in the sum of $1,925 dated May 2, 2003;
7. Check from National Financial Services, L.L.C. dated May 1, 2003, payable to Calvert A. Ostlund, Sr., in the sum of $5,460;
8. Check from National Financial Services, L.L.C. dated May 1, 2003, payable to Calvert A. Ostlund, Sr., in the sum of $2,850.
The trial judge found that each of the checks bear the signature of decedent as endorser, with instructions for deposit to the account. The endorsement instructions contained on many of the checks in the record specifically read "For Deposit in Full Only #XXXXXXXXXX" or similar restrictive language.
Gilbert, decedent's counsel, learned on January 26, 2004 of the account after decedent's death in preparing tax returns and contacted Junior to discuss same. On February 12, 2004, Junior issued a check in the sum of $338,336 from the account, liquidating it to pay the estate tax liabilities on behalf of himself and his two siblings, Steven C. Ostlund and Christine O. Roberts. Unlike New Jersey, where the estate pays the estate tax liabilities, the New York Estate, Powers and Trust Law requires beneficiaries to bear their respective estate tax obligations. See N.Y.E.P.T.L. § 2-1.8 (Consol.2006). As a result, decedent's two stepchildren received no benefit from the money held in this account.
On May 25, 2004, plaintiff filed a complaint against defendants through its executor, J.P. Morgan Chase for conversion and unjust enrichment. Plaintiff alleged that by liquidating the account and distributing the funds on their own behalf, defendants improperly converted Estate assets to the detriment of the Estate. Defendants filed an answer on July 12, 2004 acknowledging that the account funds were used to satisfy their New York State estate tax obligations but denying conversion or unjust enrichment and seeking dismissal of plaintiff's complaint.
Following the filing of pleadings, depositions of the three defendants were conducted on May 4, 2005. Discovery revealed that eight checks totaling *653 $53,559.78, payable to decedent, had been deposited by Junior to the joint account after decedent's death. Plaintiff then amended its complaint on November 14, 2005 to include a third count seeking repayment to the estate of those funds. On or about September 13, 2004, an answer to the amended complaint was filed by defendants. A bench trial was subsequently held on January 25, 2006. None of the defendants appeared at trial, but portions of their deposition testimony were read aloud into evidence, some testimony over plaintiff's objection. Several of defendants' answers to interrogatories and requests for admissions were also read at trial.
The first transcript to be read at trial was that of Junior. In his deposition, he testified that his father intended to give him "complete control over the money" and that he "had complete authority to write checks out of the account for whatever purpose" he saw fit, but failed to recall when he received this authority. Defendant testified that he never deposited any of his personal funds into the account. Defendant stated that based upon conversations with his father, it was his understanding that he could use the funds for his own personal benefit. As to decedent's financial status, defendant stated that decedent received regular compensation from the family company and that during the last three years of his life he would use a car service to get to and from work.
In an answer to an interrogatory concerning the purpose of the account, Junior stated that it was his understanding that decedent "opened the account to insure that [decedent's] living expenses were properly paid for the remainder of his life with the account to revert to [Junior] upon [decedent's] death." In another interrogatory, Junior stated that the funds from the account were not combined with his personal funds.
Junior also testified at his deposition as to decedent's health problems. According to defendant, decedent suffered from a urinary tract infection for nearly a decade, had bladder problems, and became easily tired. Junior did not mention any other physical or mental health issues. Junior also testified that he discussed his father's estate with Gilbert, but was unable to recall the exact substance of those discussions.
Portions of defendant, Steven C. Ostlund's, deposition testimony were also read aloud at trial. Steven Ostlund testified that he saw his father approximately three times a week, that decedent had health problems since 1997, that "old age was just not kind" to him and that he was forgetful in the last five or six years of his life. Steven Ostlund also testified that his father "would still come to the office semi-retired" and used a car service to get to work in Kenilworth from his Roosevelt Island, New York home and enjoyed vacationing a couple times a year in Venice and the Caribbean. Steven Ostlund also informed the court that he had not been made privy to the formation of the disputed account, but that it was his brother, Junior, who made the decision to pay the estate taxes from the account funds. Moreover, his sister, co-defendant in this matter, had not been apprised of the discussions between he and his brother and was not informed of the payment decision until after it had been made.
Decedent's daughter, defendant, Christine O. Roberts, was deposed and portions of her testimony were also read at trial. According to her, she saw her father every six months after his wife died. Moreover, during decedent's last five or six years, "[h]is health was poor," he had "increased difficulty doing things" and relied *654 on others to run errands. Roberts testified that her father would "not focus" or "pay attention" to paying bills, but "[h]e was very stubborn. He liked to have his own money. He liked to be in charge of things." To assist him, decedent had twenty-four hour caretakers that checked up on him on a daily basis.
Lastly, Roberts asserted that she knew nothing about the operation of the account before decedent's death, but was told by her brothers after his death that they had "some authority" to transfer the account's funds to Junior.
Stanley Gilbert, decedent's attorney, appeared before the court and testified at trial, generally maintaining that decedent's intent was to divide the assets between his five children and step-children. According to Gilbert, Junior was present and involved in a November 28, 2003 meeting concerning decedent's estate, along with a J.P. Morgan representative, decedent's accountant, and Gilbert himself at decedent's Roosevelt Island home. Gilbert testified that decedent had expressed to him and to his deceased wife Barbara, that he would split his estate between their five children and that Barbara had promised to do the same.
Gilbert testified that he did not know of the disputed account and that he only discovered it while preparing the estate's tax forms, prompting him to contact Junior. Junior informed him that he used the money exclusively to pay decedent's expenses, agreed that it was a convenience account, and that he never expected the account to be his property.
Gilbert also informed the court concerning his observations of the decedent's health. According to Gilbert, "within the last six or eight months" he "got the sense that [decedent was] starting to lose it" because he did not remember their discussions regarding the Estate, particularly his decision to split all of his assets five ways. Gilbert acknowledged that despite his forgetfulness, decedent "still knew who his children were . . . [and][h]e still knew how much money he had."
The trial judge rendered a verdict in favor of defendants, placing his findings of fact and conclusions of law on the record. Final judgment was entered by the trial judge on February 9, 2006. On or about March 27, 2006, plaintiff filed its notice of appeal contesting the judgment of the trial court.
On appeal, plaintiff presents the following arguments for our consideration:
I. DID THE TRIAL COURT FAIL TO APPLY THE CORRECT STANDARD TO DETERMINE WHETHER THE ACCOUNT WAS AN ASSET OF THE ESTATE OR WHETHER A JOINT TENANCY WITH RIGHT OF SURVIVORSHIP EXISTED?
II. DOES THE RECORD BELOW DEMONSTRATE THAT THE TRIAL COURT[']S RULING WAS AGAINST THE WEIGHT OF THE EVIDENCE?
Both parties acknowledge that the account is a joint account and that Junior was added to the account as a joint tenant in 2001. Accordingly, the portion of the Multiple-Party Deposit Account Act, N.J.S.A. 17:16I-1 to -17 (the "Act"), governing right of survivorship applies and must be analyzed. The statute reads in relevant part, as follows:
Sums remaining on deposit at the death of a party to a joint account belong to the surviving party or parties as against the estate of the decedent unless there is clear and convincing evidence of a different intention at the time the account is created . . .
[N.J.S.A. 17:16I-5(a).]
*655 Plaintiff produced evidence regarding decedent's intent at the time the account was created from Gilbert. As already noted, Gilbert testified about decedent's estate plan to divide his assets equally among his five children and step-children. He also testified that when he inquired concerning the account from Junior, Junior advised Gilbert that he used the money in the joint account exclusively to pay decedent's expenses and that he had agreed that it was a convenience account which he never expected to be his property. In contrast to that testimony, the deposition and interrogatories from Junior stated that decedent intended to give Junior "complete control over the money" and that Junior had "complete authority to write checks out of the account for whatever purpose" he saw fit. Further, Junior's answers to interrogatories read into the record confirmed his understanding that decedent "opened the account to ensure that [decedent's] living expenses were properly paid for the remainder of his life and that with the account to revert to [Junior] upon [decedent's] death." The Act requires the proofs to be clear and convincing if a court is to declare that the remaining sums on deposit at the death of a party to a joint account are to be payable to the estate of the decedent as opposed to the survivor. N.J.S.A. 17:16I-5(a).
Clear and convincing evidence "should produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." In re Purrazzella, 134 N.J. 228, 240, 633 A.2d 507 (1993) (quoting Aiello v. Knoll Golf Club, 64 N.J.Super. 156, 162, 165 A.2d 531 (App.Div.1960)). It must be "so clear, direct, and weighty and convincing as to enable [either a judge or jury] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." In re Seaman, 133 N.J. 67, 74, 627 A.2d 106 (1993) (quoting Aiello, supra, 64 N.J.Super. at 162, 165 A.2d 531). Appellate review of a judgment entered in a non-jury case regarding findings of a trial court is limited. Our courts have held that the findings upon which a non-jury judgment is based should not be disturbed unless they are so clearly insupportable as to result in their denial of justice. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 483, 323 A.2d 495 (1974).
The trial court's findings concerning the proofs regarding the intention of the decedent at the time the account was created are supported by the record. The only testimony produced by the Estate was Gilbert's testimony which was controverted by the proofs from Junior's deposition testimony and interrogatory answers. Consequently, the trial judge's conclusion that there was no clear and convincing evidence of an intent to have the balance of the account go to the Estate rather than the surviving joint tenant is sound and should not be disturbed.
In addition to the statutory test set forth in the Multiple-Party Deposit Account Act discussed above for determining ownership on death of a joint bank account, our courts have set forth in Pascale v. Pascale, 113 N.J. 20, 549 A.2d 782 (1988), and in In re Estate of Penna, 322 N.J.Super. 417, 731 A.2d 95 (App.Div. 1999), an alternative basis to challenge the ownership of a joint survivorship account on the death of one party. Those cases provide that, if the challenger can prove by a preponderance of the evidence that the survivor had a confidential relationship with the donor who established the account, there is a presumption of undue influence which the survivor donee must rebut by clear and convincing evidence. See Petruccio v. Petruccio, 205 N.J.Super. 577, 580-81, 501 A.2d 593 (App.Div.1985); Pascale, supra, 113 N.J. at 30-32, 549 A.2d *656 782; Penna, supra, 322 N.J.Super. at 426, 731 A.2d 95.
The first issue to be resolved under that avenue of relief is whether there existed a confidential relationship between the parties to the joint account. The nature of a confidential relationship is difficult to define. It "encompasses all relationships `whether legal, natural or conventional in their origin, in which confidence is naturally inspired, or, in fact, reasonably exists.'" Pascale, supra, 113 N.J. at 34, 549 A.2d 782 (quoting In re Fulper, 99 N.J. Eq. 293, 314, 132 A.2d 834 (Prerog.Ct.1926)). A confidential relationship includes cases where trust and confidence actually exists. It comprehends cases where,
the relations between the [contracting] parties appear to be of such a character as to render it certain that they do not deal on terms of equality, but that either on the one side from superior knowledge of the matter derived from a fiduciary relation, or from over-mastering influence; or on the other from weakness, dependence or trust justifiably reposed, unfair advantage is rendered probable. [Ibid.]
While it is true that in Pascale and Fulper, our courts have found parent-child relationships to be "among the most natural of confidential relationships," it has also been held that "the mere existence of family ties does not create . . . a confidential relationship." See Vezzetti v. Shields, 22 N.J.Super. 397, 405, 92 A.2d 28 (App.Div.1952); see also Pascale, supra, 113 N.J. at 34, 549 A.2d 782; Fulper, supra, 99 N.J. Eq. at 314, 132 A. 834. In Blake v. Brennan, the court found the test for measuring the existence of a confidential relationship is "whether the relations between the parties are of such a character of trust and confidence as to render it reasonably certain that the one party occupied a dominant position over the other and that consequently they did not deal on terms and conditions of equality." 1 N.J.Super. 446, 454, 61 A.2d 916 (Ch.Div. 1948).
The factors to be considered in determining whether a confidential relationship is present, therefore, include whether trust and confidence between the parties actually exist, whether they are dealing on terms of equality, whether one side has superior knowledge of the details and effect of a proposed transaction based on a fiduciary relationship, whether one side has exerted over-mastering influence over the other or whether one side is weak or dependent. As one court has said, "there are innumerable cases involving confidential relationships, but the courts have not been able precisely to define what it is." Stroming v. Stroming, 12 N.J.Super. 217, 224, 79 A.2d 492 (App.Div.), certif. denied, 8 N.J. 319, 85 A.2d 272 (1951). Its essentials are both "a reposed confidence and the dominant and controlling position of the beneficiary of the transaction." Ibid. "[T]he dominance must be of the mind and the dependence must be upon the mind," rather than the physical. Ibid. "It exists when the circumstances make it certain that the parties do not deal on equal terms." Ibid. It does not exist "where the parties deal on terms of equality," even though they are, at the same time, family members and business associates. Ibid. The test, then, is a fact-sensitive one, but focuses on the equality of the parties with respect to each another.
Plaintiff, at the outset, has the burden of proving, by a preponderance of the evidence, that a confidential relationship exists. Petruccio, supra, 205 N.J.Super. at 581, 501 A.2d 593. The trial court here, as the fact finder, found no confidential relationship between decedent and Junior, "[t]he proofs are lacking that there is any confidential relationship between *657 Calvert Ostlund, Sr. and Calvert Ostlund, Jr. [at] the time the account was opened." The trial judge further found no evidence of dependence or subservience and that all that was proved was the mere existence of a family relationship between decedent and Junior. In essence, the judge found a failure of proofs necessary to show inequality between the parties that would rise to the level of a confidential relationship.
The preponderance of the evidence standard requires plaintiff in this case to establish that the desired inference, that is, the existence of a confidential relationship, is more probable than not. See Biunno, Current N.J. Rules of Evidence, Comment 5 on N.J.R.E. 101(b)(1) (2007). In reviewing the trial court's determination on this point, an appellate court must "not disturb the factual findings and legal conclusions of the trial judge unless [it is] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant, and reasonably credible evidence as to offend the interest of justice." Rova Farms, supra, 65 N.J. at 484, 323 A.2d 495. The record in this case demonstrates that there is competent, relevant, and reasonably credible evidence that decedent was living independently in his New York apartment, going to work, and of sound mind during the creation of this account. There is evidence that he consulted with attorneys of his choosing and remained a stubborn man, although he did have certain health problems. Accordingly, the trial judge's findings are grounded in competent, relevant, and reasonably credible evidence and his conclusion that there did not exist a confidential relationship should not be disturbed.
Plaintiff also appeals the trial court's finding that the checks at issue totaling $53,588.78 were appropriately deposited into the joint account where they became the property of defendant, Junior. Plaintiff specifically argues that no evidence was produced supporting the presumption that decedent signed the checks or that they were transferred by decedent as a valid gift to his son. Plaintiff also argues that Junior was not a holder in due course of the checks pursuant to N.J.S.A. 12A:3-302. Defendant, on the other hand, argues that plaintiff never introduced evidence that the checks were not signed by decedent, that the endorsements were valid, and submits that under the Uniform Commercial Code, plaintiff lacks standing to raise a claim of conversion.
N.J.S.A. 3B:1-1, which deals with the administration of estates, defines "Estate" as "all of the property of the decedent." Plaintiff argued that the checks at issue were payable to decedent, in decedent's possession, and, therefore, constituted property of the Estate which should have been turned over to the executor. Certainly, at the time the checks were initially delivered to decedent and before endorsement, the checks were in the possession of decedent, made payable to him, and as such, he became the holder pursuant to N.J.S.A. 12A:1-201(20). In fact, decedent appears to have been, not merely a holder, but a holder in due course, pursuant to N.J.S.A. 12A:3-302. However, the proofs indicate and the trial court found that decedent endorsed the items restrictively with the intent that they be deposited to the account. The checks were all endorsed "for deposit only" to the account. As such, pursuant to N.J.S.A. 12A:3-206(c), the items were restrictively endorsed, which limited the ability to negotiate them further. In fact, pursuant to N.J.S.A. 12A:3-206(c)(4), should a person fail to honor the restrictive endorsement, they would be liable in conversion. See Salsman v. Nat'l Cmty. Bank, 102 N.J.Super. 482, 492, 246 A.2d 162 (Law Div.1968), *658 aff'd, 105 N.J.Super. 164, 251 A.2d 460 (App.Div.1969). By virtue of the endorsement, and delivery to Junior, Junior became the holder of the items. Under N.J.S.A. 12A:1-201(20), Junior had possession of the items and they were endorsed payable to the account. Pursuant to N.J.S.A. 12A:3-110(c)(1), if an instrument is payable to an account and the account is identified only by number, the instrument is payable to the person to whom the account is payable. In this case, by virtue of the court's ruling as to the disposition of the account, Junior became the owner of the account. Since Junior was, on decedent's death, the owner of the account and the holder of the items, he was entitled to negotiate them pursuant to N.J.S.A. 12A:3-201(a). An item may be negotiated by a person even if they are not a holder in due course. Comment 1 on N.J.S.A. 12A:3-201(a).
Plaintiff raises two arguments with respect to the analysis set forth above. The first is the validity of the signature constituting the endorsement. According to N.J.S.A. 12A:3-308(a), "in an action with respect to an instrument, the authenticity of, and authority to make, each signature on the instrument is admitted unless specifically denied in the pleadings." In this case, there was no specific denial in the pleadings. The comments to this section note that the question of the burden of establishing a signature arises only when it has been put in issue by specific denial. Comment 1 on N.J.S.A. 12A:3-308(a). While the burden is on the party claiming under the signature, the signature is presumed to be authentic. N.J.S.A. 12A:3-308(a). "Presumed" is defined in N.J.S.A. 12A:1-201(31) to mean that until some evidence is introduced which would support a finding of the signature being forged or unauthorized, the proponent is not required to prove that it is valid. In the instant case, there were no proofs set forth that would raise the issue of authenticity, and as stated earlier, there was no specific denial in the pleadings. Consequently, that argument fails.
Lastly, the Estate claims that the items were converted. Under the Uniform Commercial Code, "the conversion action is no longer available to drawers of stolen checks or to payees who never had actual or constructive possession of stolen instruments bearing their names." James J. White & Robert S. Summers, Uniform Commercial Code § 15-4(a) (West Publishing, eds., 5th ed.2000). N.J.S.A. 12A:3-420(a) provides, in part, that "[a]n action for conversion of an instrument may not be brought by the issuer or acceptor of the instrument or a payee or endorsee who did not receive delivery of the instrument either directly or through delivery to an agent or co-payee." Because the Estate never received the checks directly or through delivery by agency, unlike decedent, plaintiff was never a holder of the checks and could not assert a claim for conversion of checks that it never held. Since the trial court found that the endorsements occurred while the checks were in the possession of decedent and before the Estate existed, and as set forth above, since decedent endorsed the items payable only to the account, the Estate never became the owner of the checks. Consequently, it cannot raise an argument for conversion.
Based on the foregoing, therefore, the judgment of the trial court is affirmed in all respects.