**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1772-21

IN THE MATTER OF
THE ESTATE OF
JAMES G. MARTIN,
deceased.

_____

Submitted December 13, 2023 – Decided January 11, 2024

Before Judges Accurso and Vernoia.

On appeal from the Superior Court of New Jersey, Chancery Division, Monmouth County, Docket No. P-000399-20.

Buchan, Palo & Cardamone, LLC, attorneys for appellants James H. Martin, Michael P. Martin and Ann Martin (Stephanie Palo and David R. Cardamone, on the briefs).

Drazin and Warshaw, PC, attorneys for respondent Therese Rogers (Ralph E. Polcari, on the brief).

PER CURIAM

James H. Martin (Jimmy), Michael P. Martin (Mickey) and Ann P.

Martin appeal the Probate Part's January 27, 2022 order admitting the March

29, 2019 Will of the decedent, their father James G. Martin, to probate and

dismissing their complaint alleging undue influence by their sister, Therese

Rogers, the named executor and nearly sole beneficiary of the 2019 Will.[1]  We

reverse.

Although the parties disagree on almost every critical point, they do not

dispute the following facts, which provide the backdrop of this will contest.

The decedent and his first wife had six children, Jimmy, Mickey, Ann,

Thomas, Nora and Therese.  Their mother died in 1991, and their father

married his second-wife, Louise, later that year.  Neither Nora nor Therese got

along with Louise, and thus were estranged from their father for a significant

part of the twenty-seven years of his second marriage.  A Will executed by the

decedent in 2017, the year before Louise's death, provided her a life estate in

decedent's home, with all related expenses to be paid by his estate during her

residence; left the contents to her outright; directed a $10,000 specific bequest

to Louise's daughter, the named executor; and divided the remainder, twenty

percent each to Jimmy, Mickey, Thomas and Ann, with the remaining twenty

---

[1]  Because several of the parties share the same family name, we refer to them
by their given names for clarity and convenience, intending no disrespect.  We
note that Thomas, although originally a plaintiff in the action, was no longer a
party at the time judgment was entered.

A-1772-21

percent to be split between two grandchildren. The decedent specifically directed that neither Nora nor Therese should receive any share of his estate.

A month after Louise's death in October 2018, Jimmy contacted Barbara Downs McNulty about preparing a new Will for his father, who was then ninety-four years old. Neither the decedent nor Jimmy knew McNulty, who had purchased the law practice of decedent's prior attorney. Jimmy took his father to McNulty's office to discuss the provisions of a new Will, which was executed two days later.

The November 2018 Will contained a specific $10,000 bequest to Jimmy for his assistance to the decedent "financially with the payment of my mortgage and other bills during my lifetime"; and divided the remainder of the estate, twenty-two-and-one-half percent each to Jimmy, Mickey, Thomas, and Ann, with the remaining ten percent to Ann's son, Dutch, who, like the decedent, had served in the military and was close to his grandfather. As with his 2017 Will, the decedent did not provide for Nora and Therese in his 2018 Will.

The parties do not dispute that Jimmy, a physician employed by the Department of Veteran's Affairs in Chicago, had provided his father $10,000 for dental work, given him two Lincoln autos over the years and in August

A-1772-21

2018, began depositing $400 a month into his father's bank account to assist him in making monthly payments on a $100,000 home equity line of credit. Jimmy also arranged for his father's home health care benefits through the VA, including aides three or four days a week and the installation of a wheelchair ramp. Jimmy also built a disabled shower unit for his father and arranged for home visits by a physician assistant affiliated with the decedent's doctor.

Shortly after executing his 2018 Will, the decedent suffered a fall and was hospitalized until Christmas. Both Therese and Nora visited their father in the hospital, the first either had seen him in years. On December 28, days after the decedent returned home, Jimmy suggested to his father that he consider adding Therese and Nora to his Will, treating them as he did the rest of his children. The decedent agreed and Jimmy emailed McNulty at his father's request that his father wanted Nora and Therese included in the Will, and that Ann's share should go to her son, Dutch.

Although Jimmy had been providing for his father's care with the assistance of the VA nurses during Louise's last illness and after her death, his father required round-the-clock care after his release from the hospital. Jimmy asked his sisters for help. Therese volunteered to move in and care for their father with Jimmy and Ann's help, while retaining the services of the VA nurse

4

aides. Jimmy instructed Therese how to provide their father his insulin injections and maintain his catheter and also showed her how to care for the pressure sores he'd acquired during his long hospital stay.

The plan quickly went off the rails, however. After Jimmy returned from a week in Chicago in mid-January 2019, he and his father had an argument, with the decedent angrily telling Jimmy that he would never have been a doctor if it wasn't for decedent. That same day, the decedent called McNulty to say he wanted Jimmy removed from his Will because "he's a crook." Two days later, Therese and Ann accused Jimmy to their father of touching them inappropriately when they were children. Jimmy denied it, and he claims Ann has since recanted the allegation, but Therese, who had previously made Jimmy her daughter's godfather, continued to insist it was true. Jimmy packed his things that afternoon and returned to Chicago, never seeing or speaking to his father again.

Within a week, the decedent had revoked Jimmy's power-of-attorney and executed a new durable power making Therese his attorney-in-fact. McNulty's notes of a meeting she had with the decedent at his home on January 18 reflect the decedent's belief that Jimmy had "done questionable things" since decedent had last met with McNulty, that the decedent "found out things" through

5

review of his Chase banking records, and that he believed "Jimmy will go to Social Services to have [the] house taken away." The notes also reflect the decedent's feeling that "Therese has done great/everything for [the decedent] since Xmas. And Ann has helped."

The decedent thereafter had conversations and meetings with McNulty about a new Will. Although he never wavered about disinheriting Jimmy, he was not sure about how to otherwise devise his assets. McNulty's notes from a telephone call with the decedent on January 25 reflect he was still uncertain about the distribution of his estate and needed more time to consider the changes he wanted in his Will. He told McNulty he didn't want to give money "to his daughter [Ann] because she was on SSD (Social Security disability)," and that "Mickey can't accept [a bequest] because he owes the hospital" money.

McNulty's notes from a February 26 meeting state the decedent told her "[h]e has a line of credit for $100k," which he had drawn down completely to re-shingle the roof, repair the driveway, paint and buy a car for Louise. The notes also reflect the decedent told McNulty that "Therese and her husband will pay off the line of credit . . . when [the] house sells," that "Nora doesn't want anything" so he would exclude her, that he is "very, very angry" at

6

Jimmy and doesn't "want to give him anything," that Mickey "owes Freehold Hospital a lot of [money] so [he didn't] want to give him anything," and that the decedent was "most concerned about Therese — as she [was] caring for him" and "gave up a job to come here." Those notes end with the notation that decedent "wasn't 100% sure what he wanted to do and he [would] call [McNulty] next week with his decisions."

McNulty received an email on March 1 from Therese with the re line: "Jims will . . . again." The message states "You must think we are nuts. . . . But we have it figured out . . . when ever you get a chance if you can call, or come by. . . . I promise its going to be quick and easy. . . ." McNulty also received a telephone message on March 6 from Thomas reporting "Family came to a simple agreement re [the decedent]."

The following day, Therese had a conference alone with McNulty in her office. Therese provided McNulty a writing, which Theresa claimed was dictated to her by her father, which left virtually his entire estate to her. McNulty's notes reflect Therese's feeling "that Louise's kids bought houses around the time her Dad took the $100,000 . . . loan out on [the house]," and that her father wanted "to give Therese everything and $100 to each of his [other] kids" and nothing to any of the grandkids because "[Jimmy] molested

7

Therese and Ann." McNulty's notes further reflect Therese's statement that "[e]ach of [the decedent's] other kids (other than Tommy) own their own houses outright and have their own [money]," whereas "Therese never had a house" and "each of Therese's sisters had a wedding that Dad paid for, and Dad didn't even come to Therese's wedding."

McNulty's notes reflect a telephone conference with the decedent the following day in which he confirmed he wanted to leave his house and all his property to Therese "because Therese is taking very good care of [him]" and would give the rest of his five children and his grandson Dutch $100 each. McNulty wrote in her notes that the decedent "was very certain with what he said above" and "repeated the above several times." Therese picked up the final draft of the Will from McNulty's office on March 20, hand-delivering it to her father for his review.

The decedent executed the new Will on March 29, 2019, making specific bequests of $100 each to Jimmy, Mickey, Thomas, Ann, Nora, and his grandson Dutch, leaving the remainder of his estate to Therese, whom he also named his executor.

The matter was tried for two days before the Probate Part, with the court hearing testimony from Jimmy, Mickey, Nora, Therese and McNulty.

Following receipt of the testimony and written summations, the judge put an opinion on the record explaining his reasons for finding plaintiffs had not sustained their burden of proof on their complaint to void the 2019 Will.

The judge summarized the testimony to be that Jimmy, a medical doctor, had taken care of his father a "great deal" and tried to help him by making several "changes to the house in order to make his father more comfortable" and had what was testified to as a "close relationship with his father." The judge noted the allegations against Jimmy by Therese, which "Jimmy vehemently denied," and the emotional falling out between Jimmy and his father in January 2019 being so significant that Jimmy left, never to see or speak to his father again, and that the decedent referred to Jimmy "at various times in various communications" thereafter, particularly with McNulty, "as a crook," who "didn't deserve to be his son."

The judge focused his opinion almost exclusively on McNulty's testimony, which was largely based on contemporaneous notes she'd made of her meetings and phone conversations with the decedent and others. The judge mentioned notes McNulty took of an unsolicited telephone conversation with a lawyer on January 15, 2019, who claimed to be familiar with the decedent and had drafted several wills for him. McNulty testified she wasn't sure why the

9

lawyer telephoned her, other than to provide her some background on the family, the members of which "did not get along" according to him.

The lawyer expressed the view that Jimmy, who in the lawyer's view was "[t]he only one [of the decedent's children] that has the resources, financial and otherwise, and the intellect to help" the decedent, had become more involved in his care, and that "one of his daughters" was "living with him" in his house. The lawyer told McNulty the decedent could be mercurial and "gets fixed in his mind about . . . disinheriting." Most recently, the lawyer said the decedent had telephoned him repeatedly, adamant that he wanted to disinherit Jimmy, completely contrary to the 2018 Will, which the lawyer had reviewed, over "a beef" between the two. The lawyer refused to prepare a new will for the decedent, and suggested McNulty "get the true intention here." The lawyer signed off saying he would call the decedent to tell him he had spoken to McNulty.

The judge laid out the timeline of events between McNulty's first contact with Jimmy in November 2018 through the execution of the decedent's last Will in March 2019, which the judge found reflected "a strong-willed individual who maintained control over his assets and properties and appears to have given substantial thought to his Will, what should happen to his

10

property and those thoughts frequently changed." The judge found the lawyer who made the unsolicited call to McNulty "appears" to have had "a credible and accurate" view of the "volatile dynamic" of this family.

The judge found McNulty testified "credibly" about the "written note and communication [she received] on March the 7th" and the phone conversation she had the following day with the decedent "confirming that the contents of the writing was what he wanted, not what someone else wanted. And that it was his desire reflected in the written note." The judge found McNulty testified "credibly and believably" that when she met with the decedent on March 29th to execute his Will, "the decedent was lucid, in control of his faculties and that he was making a decision based on what he wanted and not under the influence of anyone, particularly not under the influence of Therese." Finding "the evidence clear . . . that the Will executed on March the 29th of 2019 [was] not the product of undue influence," the judge discharged the caveats and admitted the Will to probate to be administered by Therese as the decedent's executor.

Plaintiffs appeal, contending the Probate judge failed to engage in a burden-shifting analysis in determining whether the decedent's Will was a product of undue influence, that the judge erred "by appearing to rely on the

11

testimony of a single witness," McNulty, and failing to consider the testimony of the other witnesses, and thus abused his discretion in determining the 2019 Will was not the product of undue influence.  We agree on all points.

Analysis of a claim of undue influence, that is "'mental, moral or physical' exertion which has destroyed the 'free agency of a testator' by preventing the testator 'from following the dictates of his own mind and will and accepting instead the domination and influence of another,'" in the disposition of his assets, Haynes v. First Nat'l State Bank, 87 N.J. 163, 176 (1981) (quoting In re Neuman, 133 N.J. Eq. 532, 534 (E. & A. 1943)), follows a well-established paradigm.  "The burden of establishing undue influence rests with the party contesting the will," In re Estate of Folcher, 224 N.J. 496, 512 (2016), "unless the will benefits one who stood in a confidential relationship to the testatrix and there are additional circumstances of a suspicious character present which require explanation," In re Will of Rittenhouse, 19 N.J. 376, 378-379 (1955).  When there is a confidential relationship, that is "where trust is reposed by reason of the testator's weakness or dependence or where the parties occupied relations in which reliance is naturally inspired or in fact exists," In re Estate of Hopper, 9 N.J. 280, 282 (1982), and suspicious circumstances, "which need only be slight," a

12

presumption of undue influence arises, and the burden of proof shifts to the proponent of the will "to overcome the presumption," In re Estate of Stockdale, 196 N.J. 275, 303 (2008), ordinarily by a preponderance of the evidence, Haynes, 87 N.J. at 177-78.

As the Supreme Court noted over fifteen years ago, "the burdens of proof and the issues to be considered" in an undue influence case "have been firmly established in our case law." Stockdale, 196 N.J. 275, 302. There is in the Probate judge's opinion here, however, no discussion of this analytical framework. Therese contends we can infer the judge applied a presumption of undue influence by his statement that the decedent being "in an infirm state physically," when he considered the beneficiary changes he ultimately made in March 2019, a period in which he was being cared for by Therese, "certainly gives rise to a reasonable suspicion that this will was the product of undue influence."

Those remarks, however, were made by the judge in explaining his reasons for a fee award to plaintiffs, not the rejection of their undue influence claim. Addressing the undue influence claim, the judge found plaintiffs had failed to sustain their burden of proof, and their complaint was without merit. Although we acknowledge it might be possible to make the inference Therese

urges, we are reluctant to do so as the court omitted entirely any discussion of the role Therese played in the changes to her father's Will, and the cases make clear "the mere existence of family ties does not create . . . a confidential relationship." Estate of Ostlund v. Ostlund, 391 N.J. Super. 390, 401-402 (App. Div. 2007) (quoting Vezzetti v. Shields, 22 N.J. Super. 397, 405 (App. Div. 1952)).

It goes without saying that neither the parties nor a reviewing court should have to guess at which side the judge assigned the burden of proof in an undue influence case, given the profound effect it can have on the outcome. See In re Week's Estate, 29 N.J. Super. 533, 540 (App. Div. 1954) (noting "[i]n a case where the evidence raising up the presumption of undue influence weighs heavily in the balance of proofs, the evidence upon which proponent relies must, if he is to succeed, be of greater weight."). Here, our study of the judge's decision leaves us genuinely uncertain whether the judge found plaintiffs failed to muster sufficient evidence to give rise to a presumption of undue influence or whether he found Therese had amassed sufficient evidence to rebut it. We conclude the judge's factual findings are woefully inadequate either way.

14

It is axiomatic that "[t]he findings of the trial court on the issues of testamentary capacity and undue influence, though not controlling, are entitled to great weight since the trial court had the opportunity of seeing and hearing the witnesses and forming an opinion as to the credibility of their testimony." Gellert v. Livingston, 5 N.J. 65, 78 (1950). "An appellate court is bound by the trial judge's determination of credibility and those findings of fact which are reasonably supported by the record." C.B. Snyder Realty, Inc. v. BMW of North America Inc., 233 N.J. Super. 65, 69 (App. Div. 1989). Where, however, "the focus of the dispute is not on credibility but, rather, alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn" from those facts, "the appellate function broadens somewhat." Ibid. That's the case here.

We have no quarrel with the judge's finding that McNulty was a credible witness, sincere in her belief that the decedent was not the victim of undue influence in connection with the execution of his 2019 Will. But the judge viewed her testimony uncritically, to the point of obscuring through his use of the passive voice that the "written note and communication" McNulty "received" on March 7 stating that the decedent was leaving virtually his entire estate to Therese was a document written by Therese, which she hand-

15

delivered to McNulty when the two met alone to discuss the decedent's Will, a fact one might think deserved more scrutiny. See Haynes, 87 N.J. at 179-80.

The judge also failed to consider that McNulty had met and spoken with the decedent only about a dozen times from their first meeting in November 2018 through execution of the decedent's Last Will in 2019. She did not possess the advantage of assessing an elderly client in the way a lawyer who had represented the client over many years or decades would have. McNulty inherited the decedent as a client when she bought his former lawyer's practice. And although the court focused in on the unsolicited call McNulty received from a lawyer for a reason she could not work out, terming his assessment of the decedent and the family dynamic "credible and accurate," we think the call had greater meaning and a fairly obvious purpose.

McNulty testified she "was a little surprised" by the call and "just wasn't sure why [the lawyer] was calling" her. She concluded the lawyer "just seemed to be telling me whatever was going on, kind of thing. That's how I took it." McNulty's notes, however, reflect the lawyer provided his name, his firm's name, and the nature of his practice. He told her he'd drafted several wills for the decedent in the past and had reviewed the Will McNulty drafted for him in 2018. The caller obviously knew the decedent and his family well,

16

mentioning the recent dispute with Louise's children over payment of her funeral expenses and the "beef" between Jimmy and his father.

McNulty's notes reflect the lawyer told her the decedent had "been calling [the lawyer] repeatedly" about wanting to "disinherit Jimmy → which is totally contrary to his 11/2018 Will → why." Critically, the lawyer told McNulty, and apparently the decedent, that he was unwilling to prepare a new Will for the decedent. Besides expressing the view that Jimmy was the only one of the decedent's children with the resources to help him and that Jimmy had been more involved in his father's care, the lawyer also mentioned that one of the decedent's daughters was living with decedent, and that "BDM (Barbara Downs McNulty) [needed] to get the true intention here."

Asked at trial what she understood after that call "needed to be done for [her] client in revising his Will," McNulty answered "I don't know, it says [the lawyer] will call [the decedent]. I don't know if he ever did. I mean, I don't know, I got the impression that he was just calling to sort of . . . . talk[] about the family dynamics and disinheriting and, you know." Asked whether the note "BDM to get the true intention here," was McNulty "indicating [she] wanted to get the true intention, she replied "No, no, I just was writing down what — what [the lawyer] was saying."

A-1772-21

We agree with the Probate judge that the purpose of the call was to provide McNulty a sense of the volatile family dynamic. But it also appears the lawyer was offering her a friendly word of caution about the things the decedent would "get fixed in his mind" and to advise her to be sure she understood before preparing the decedent's Will — a task the caller declined to take on — what the decedent's "true intention" was in wishing to change the Will he'd signed only two months before to disinherit the child who'd been most involved in his care and, at least to the lawyer, appeared the only one with the resources and intellect to assist him going forward.

McNulty, however, never probed the decedent's reasons for the dramatic changes he was making to his Will. She never asked the decedent why he thought Jimmy was a crook, what the decedent had seen in the Chase banking records that led him to believe Jimmy had mishandled his finances or done "questionable things" or why he believed Jimmy intended to "go to Social Services to have [the] house taken away." McNulty also never asked why the decedent would disinherit Mickey over unpaid hospital bills, and who told him Mickey had outstanding hospital bills. The trial judge never discussed those questions in his opinion, notwithstanding the evidence at trial revealed no irregularities in the decedent's finances, no evidence of any report to Social

18

Services and that Mickey, albeit hospitalized for a time in 2017, appears never to have had outstanding medical bills.

The trial judge didn't comment on that evidence or on the credibility of any witness other than McNulty. Most significantly, the judge did not comment on Therese's testimony or credibility, notwithstanding the many instances in which her trial testimony was at odds with her answers to interrogatories and her testimony at deposition. Most notably, Therese claimed both in answers to interrogatories and in a certification she filed in opposition to plaintiffs' application for an order to show cause that she never discussed the contents of her father's 2019 Will with him and only learned after it was signed that her father had made her the virtual sole beneficiary of his estate. As Therese was forced to admit at trial, her averments were not true.

Therese also denied in her answers to interrogatories sending any texts or email messages to anyone about the terms of the decedent's Will, statements she was forced to retract at trial after being confronted with texts and email exchanges with Ann and Thomas, some of which referenced "an agreement" as to the terms of the Will. Therese was also forced to concede that she'd had

19

several conversations with Ann, Nora and Thomas and their father about the terms of the Will, notwithstanding her previous averments to the contrary.

Prior to trial, Therese also denied, or didn't recall, the private meeting she had with McNulty to discuss her father making her his sole beneficiary. And although McNulty testified the decedent told her he had drawn down the entire $100,000 line of credit for home renovations and a car for Louise, McNulty's notes of that meeting state "Therese feels that Louise's kids bought houses around the time her Dad took the $100,000 loan out on the house." Therese testified her father directed her to say that, and he had her "look up" whether Louise's children had purchased homes around the time he took out that loan.

Therese also testified she assisted her father in hiring a handwriting expert around the time the 2019 Will was signed to determine whether Louise "had been stealing money from him." Although Therese denied her father was "becoming paranoid . . . about what was happening with his finances," she claimed what "woke him up" was noticing "a lot of money in his account" after Louise's death, at a time "when Jimmy was in charge of all [the decedent's] banking." According to Therese, the decedent asked her "to get his old books, and that's when we noticed" Louise "was writing checks every week, 750, 600,

20

lots and lots of money." Therese claimed the decedent confronted Louise's son about her having "forged a lot of checks," and when Therese presented copies "of the check, the receipt, whatever," to him at her father's request, Louise's son told the decedent, "you need to ask Jimmy about that." As already noted, there was no evidence presented at trial of any irregularities in the decedent's finances.

We express no view on the credibility of any of the witnesses or on the testimony they offered. These cases are exquisitely fact-sensitive, and we have long recognized that "[n]ot all influence is undue influence." Gellert, 5 N.J. at 73. We note only that reasoned fact finding requires the trier of fact to weigh conflicting evidence, not ignore it or explain it away by refusing to acknowledge its import for proof of a proposition or its defense. See Pioneer Nat'l Title Ins. Co. v. Lucas, 155 N.J. Super. 332, 339 (App. Div. 1978) (reversing findings in a bench trial based on the trial court's failure to "properly evaluate significant evidence," resulting in "manifestly erroneous" inferences from the evidence), aff'd, 78 N.J. 320 (1978). The Probate judge's failure to address the significant conflicting evidence in this record, to make credibility findings, and to "show his work" by explaining how he applied the

burden-shifting paradigm in this undue influence case, convince us the judgment cannot stand.[2][3]

We thus reverse the order admitting the Will to probate, reinstate the complaint and remand for further proceedings consistent with the views expressed herein. We do not retain jurisdiction.

Reversed and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[2] We decline plaintiffs' request that we exercise original jurisdiction to bring the matter to conclusion. "Appellate review . . . 'does not consist of weighing evidence anew and making independent factual findings; rather, our function is to determine whether there is adequate evidence to support the judgment rendered' by the trial court." Allstate Ins. Co. v. Fisher, 408 N.J. Super. 289, 302 (App. Div. 2009) (quoting Cannuscio v. Claridge Hotel & Casino, 319 N.J. Super. 342, 347 (App. Div. 1999)).

[3] To best preserve for the parties the assurance of a fair and impartial hearing, we direct the matter be heard by a different judge on remand. See P.T. v. M.S., 325 N.J. Super. 193, 221 (App. Div. 1999).

A-1772-21